## PEYTON DU-PONT SECURITIES CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 412.

Circuit Court of Appeals, Second Circuit.

Aug. 29, 1933.

Walter J. Bartnett, of New York City, for petitioner.

Sewall Key, A. H. Conner, and John H. McEvers, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and J. M. Leinenkugel, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

In 1923, the petitioner and three other corporations, Southern Menhaden Corpora-

tion, McIntosh-Morello Orchards Company, Inc., and Charles J. Maxwell & Co., which will hereafter be referred to as Menhaden, Orchards, and Maxwell, occupied the same offices, had interlocking directorates, were operated together by the same persons, and were financed by the petitioner.

Separate returns were filed for 1922 by the petitioner, by Menhaden, and by Maxwell. The commissioner did not thereafter grant permission to file a consolidated return. Petitioner was organized in May, 1922, and first acquired stock in Menhaden on June 27, 1922. It first acquired stock in Maxwell on November 21, 1922, when it took all of its capital stock. It first acquired stock in Orchards in April, 1923, when that corporation was organized. On May 14, 1923, the petitioner sold 33⅓ per cent. of its stock in Maxwell to the manager of that corporation under an agreement that if the corporation were sold this stock should be sold with that of the petitioner and that if the manager left the employ of Maxwell the petitioner should have the first call upon his stock.

During the latter part of 1923, and for a period so long that it is not to be taken as negligible, the petitioner owned 75.54 per cent. of the capital stock of Menhaden; 71.48 per cent. of the stock of Orchards; and 66⅔ per cent. of the stock of Maxwell. The remaining Maxwell stock was owned by a Mr. Waugh; was held by the petitioner as collateral against a loan made to Waugh; and could have been taken by the petitioner upon the default of Waugh in payment of the loan. The petitioner could and did in 1923 have all the shares in the three other corporations, owned as above set forth, voted at meetings of the several corporations as it desired.

Menhaden was engaged in the business of catching the nonedible fish of that name and converting them into oil and fertilizer. It was a highly speculative business in which the profits in a good season were apt to be large and in a poor season the losses were likely to be large also. During 1922, Menhaden borrowed $22,666.67, and in 1923 $37,833.33, from the petitioner and gave the petitioner its promissory notes for those amounts. On April 4, 1923, the petitioner purchased of Frank L. Connable promissory notes of Menhaden of the face value of $117,762.22 for $95,256.33. In 1923, Menhaden had a poor fishing season and sustained a loss of $244,936.08. On December 31, 1923, the petitioner charged off on its books as worthless the notes it had purchased of Connable in the amount it had paid for them after making a slight

adjustment which is not now material and will be disregarded. It did not charge off then the notes it held for the money it had loaned Menhaden. When it purchased the notes of Connable in April, 1923, it also bought of him 1,388 shares of Menhaden stock for $1. None of the Menhaden notes have ever been paid and they never will be.

The statutes applicable are sections 240 (a) (c) and 234 (a) (5) of the Revenue Act of 1921 (42 Stat. 254, 260):

"Sec. 240 (a) That corporations which are affiliated within the meaning of this section may, for any taxable year beginning on or after January 1, 1922, make separate returns or, under regulations prescribed by the Commissioner with the approval of the Secretary, make a consolidated return of net income for the purpose of this title, in which case the taxes thereunder shall be computed and determined upon the basis of such return. If return is made on either of such bases, all returns thereafter made shall be upon the same basis unless permission to change the basis is granted by the Commissioner. * * *

"(c) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests."

"Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * * (5) Debts ascertained to be worthless and charged off within the taxable year (or in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part * * *."

See, also, T. R. 62; articles 632, 633, and 634.

The claim of the petitioner that a consolidated return could be filed for these four corporations in 1923 is untenable. At no time during that year did the petitioner own or control substantially all the stock in all of them, though it did own all of the Maxwell stock until May 14, 1923. Ignoring the period of 100 per cent. Maxwell ownership for the present, the right to file a consolidated return depends upon whether 75.54 per cent. in Menhaden, 66⅔ per cent. in Maxwell, and

67.89 per cent. in Orchards was enough. This was not substantially all. Good Mfg. Co. v. Burnet, 61 App. D. C. 133, 58 F.(2d) 685; Burnet v. Bank of Italy (C. C. A.) 46 F.(2d) 629, 630; United States v. Cleveland, P. & E. R. Co. (C. C. A.) 42 F.(2d) 413; Jos. Denunzio Fruit Co. v. Commissioner (C. C. A.) 49 F.(2d) 41; Atlantic City Electric Co. v. Commissioner, 288 U. S. 152, 53 S. Ct. 383, 77 L. Ed. 667; Handy & Harman v. Burnet, 284 U. S. 136, 52 S. Ct. 51, 76 L. Ed. 207. Nor can business control, nor the permitted control of stock not legally enforceable satisfy the requirement of the statute. See Handy & Harman v. Burnet, supra; Ice Service Co. v. Commissioner (C. C. A.) 30 F.(2d) 230; Commissioner v. Adolph Hirsch & Co. (C. C. A.) 30 F.(2d) 645. Consequently there could be no consolidated return for the group based on ownership or control of substantially all the stock by the petitioner. The stock owned by the manager of Maxwell and held by the petitioner as collateral for a loan was not controlled under Handy & Harman v. Burnet, supra. The agreement of the manager to sell it if the petitioner sold its stock did not give the statutory control, for, though the petitioner could control its sale by selling its own stock, if it enforced that right it thereby ceased to have any stock interest in Maxwell itself. Permitting the stock to be voted as the petitioner desired was not enough for proxies revocable at will do not give statutory control. Commissioner v. City Button Works (C. C. A.) 49 F.(2d) 705. Even if the stock of Waugh in Orchards could be added to that of the petitioner, there would be only an 87.46 per cent. ownership in the two and that would still be less than substantially all. See Good Mfg. Co. v. Burnet, supra.

■ Nor can the claim of right to file a consolidated return be supported on the ground that the same interests owned or controlled substantially all the stock. This must be in substantially the same proportions in the units in the group. Handy & Harman v. Burnet, supra; Commissioner v. City Button Works, supra. There is no proof of this essential fact.

■ The claim that consolidation with Maxwell while the petitioner owned 100 per cent. of its stock in 1923 gave the right to file a consolidated return for that year is erroneous, not because the petitioner and Maxwell alone were not during that period related by stock ownership as the statute requires for a consolidated return as to them alone, but because no consolidated return for the two was filed for 1922 when the stock ownership was the same and the statute permitted either a consolidated return or separate ones. The commissioner gave no permission to change after the election to file separate returns had been made. See Lucas v. St. Louis National Baseball Club (C. C. A.) 42 F.(2d) 984; Alameda Investment Co. v. McLaughlin (C. C. A.) 33 F.(2d) 120; Duke Power Co. v. Commissioner (C. C. A.) 44 F.(2d) 543. Moreover, the consolidated return filed by the petitioner in 1923 included other corporations than the Maxwell itself. The decision that no consolidated return could be filed for this group in 1923 was correct.

■■ One remaining question is whether the petitioner was entitled to charge off as worthless in 1923 the notes it purchased of Connable and take a deduction for a debt ascertained to be worthless. This depends upon whether the facts shown support the claim that the petitioner then had good reason for its belief that the notes were worthless. It did charge them off, so its belief that they were worthless has been shown. We think the facts show this belief to have been well grounded. Menhaden had lost $244,936.08 that year. It was heavily in debt as shown by its notes and had $436,000 of first mortgage bonds outstanding. It was clearly in such condition that its only hope was a highly successful fishing season or a succession of them. That depended upon the run of fish, which could neither be foreseen or controlled. How long a business dependent upon a factor so uncertain need sustain large losses before it is reasonable to give up faith in success is incapable of being stated as a matter of law. Certainly as is said in United States v. S. S. White Dental Mfg. Co., 274 U. S. 398, 403, 47 S. Ct. 598, 71 L. Ed. 1120, a taxpayer need not be an "incorrigible optimist." If it appeared that the value of these notes depended wholly upon the future success of Menhaden, it would be easy to understand that the petitioner might well have refused to carry as an asset the notes charged off. In that event, while it may be said that a good season would have supplied the funds to pay them, a poor season would have pushed Menhaden so much nearer insolvency. What the future held in store was, so far as business profits were concerned, highly problematical. The petitioner lays much stress on this phase of the matter and it justly may do so. The difficulty with its attempt to show error on the part of the board lies in the fact that the petitioner has not disclosed the asset side of Menhaden as of the time the notes were charged off. Ob-

viously, no matter what its obligations then were and no matter what losses it had sustained, the notes were not worthless if its assets then fairly valued were sufficient to pay them in whole or in part as they matured. The petitioner's offer of evidence as to the Menhaden assets, or to be a bit more accurate, its lack of assets is not as of the time the notes were charged off in December, 1923, but in subsequent years when Menhaden was doubtless insolvent. The board rejected this offer of proof and its refusal to accept it is assigned as error. In brief, the evidence as to Menhaden was that in 1924 it sustained additional losses in conducting its business and that after December 31, 1924, an attempt to liquidate it was made. In January, 1926, some of its property was sold and in March of that year a small steamer. The proceeds were distributed to the bondholders pro rata. The offer included proof that upon final liquidation of Menhaden its bondholders will receive less than 50 per cent. and its noteholders and other general creditors nothing. This evidence was not sufficient to show that the notes were worthless in 1923, nor did it disclose facts upon which the petitioner could have relied when it wrote off the notes since those facts could not then have been known. At most, it goes to show that the judgment of the petitioner as to the value of the notes in December, 1923, based on what it then knew was correct. We think it should have been considered by the board, not as evidence of the fact of worthlessness, but in evaluating the soundness of the petitioner's decision in December, 1923, and the reasonableness of its demonstrated belief on the facts it then knew that the notes were then worthless. Of course, this could have been but a prophecy of future events from an analysis of known facts based on the petitioner's judgment and experience in the business it was conducting. The fact that it did determine correctly that these notes were worthless is potent evidence that it might reasonably reach that conclusion when and as it did and the board should not have ignored it. It is difficult in close cases to say when a taxpayer may call a debt worthless, but when in fact he has ascertained it to be worthless and made that conclusion manifest by writing off the debt on his books he should be permitted to show, when his right so to do is later questioned, that his judgment of then present value has been confirmed by subsequent events. Unless his determination of worthlessness was made without any basis in reason, and so not in good faith, it should be given effect when shown to have

been right. We know that the petitioner then knew that a corporation whose unsecured notes it held was engaged in a highly speculative business and had sustained a heavy loss. We know that the petitioner then decided that these notes were worthless and charged them off as such. We know that its judgment of their value was correct. It is, therefore, going far to say that the judgment of the petitioner based, as it must have been, upon this information it then had concerning Menhaden, was at the time unjustified. We think it is an invasion of the rights of the petitioner to hold that, though it foresaw what would happen and acted to write off the notes in accordance with the judgment it then had as to their value, it may not have the benefit of the statutory deduction on the theory that it could not have foreseen that Menhaden would fail. The fact is that it did foresee just that. Perhaps the basis of its prediction is somewhat meager as shown by this record, but a basis is not wholly lacking. Compare U. S. v. S. S. White Dental Mfg. Co., supra.

Some point has been made of the fact that petitioner did not also charge off the Menhaden notes it held for money advanced. The failure to charge off the remainder of the notes in 1923 makes it impossible for the petitioner to take a deduction for them in that taxable year and perhaps in any other, for the inconsistency in carrying some and charging off others would doubtless stare the petitioner in the face if it attempted to show that the notes carried were not until a later year ascertained to be worthless. Yet, the failure of a taxpayer to charge off all the debts it might does not prevent the deduction of actually worthless debts actually charged off though others carried on its books were equally worthless.

The suggestion that Connable may have been liable as indorser on the notes presents a possibility only and cannot change the result in view of the fact that the petitioner could prove that the notes were of no value. If he did indorse them, there is no proof that his indorsement was of such value that the petitioner could not fairly have ascertained, as it did, in 1923 that they were worthless.

During 1923, the petitioner, which kept its books on the accrual basis, charged these other corporations and one called Delvatex Petroleum Corporation, which was in some respects in like situation as to the petitioner, certain sums for interest and commissions which became due from them to the petition-

722

er in 1923. These credits on the petitioner's books were offset by corresponding charges to expense on the books of the other corporations which would have done away with their effect on income taxes had a consolidated return been permitted for the group. As stated in the petitioner's brief, "The sole purpose of the entries, however, was to record amounts which petitioner might some day collect from its subsidiaries provided the condition of the subsidiaries should subsequently improve to such an extent as to render the items collectible." It is apparent that these items were entered on the petitioner's books and carried there as accrued income in the taxable period. To be sure it has been stipulated that "at no time has the petitioner been able to collect said sums or any part thereof." This is now urged upon us as an admission that when the entries were made the charges were uncollectible, and did not reflect income under the decision in Corn Exchange Bank v. United States (C. C. A.) 37 F.(2d) 34. We do not think it may fairly be pressed so far and that the petitioner has failed to show that it had no reasonable expectancy, either when it was accrued on its books or at any time during the taxable year, that this income would not be received in due course. It stands like accrued income generally, and when it could not be collected the petitioner was entitled to such adjustment in a later year as the law allowed.

Finally, what the board has treated as advances made to Orchards and to another corporation, the Marble Company, by way of salaries paid petitioner's employees and charged to those corporations and rent paid in behalf of such corporations and charged to them, are claimed to be deductible as business expenses of the petitioner. Perhaps these items could properly have been charged to expenses by the petitioner, but the fact is that they were not. It elected to treat them, not as expenses of its own, but as advances to be paid by the corporations against which the charges were made. Simply because they have not been paid as expected, though the liability of the corporations is unquestioned, does not permit the petitioner to deduct as a business expense what it did not see fit to treat as such until its debtors were unable to pay.

The decision is reversed, and the cause remanded to the Board of Tax Appeals, with directions to modify its decision by allowing a deduction on account of the Menhaden notes charged off.