SOLLITT CONSTRUCTION
COMPANY, INC.

v.

The UNITED STATES.

No. 458-78.

United States Claims Court.

Jan. 13, 1983.

---

**11.** *King v. United States,* 205 Ct.Cl. 512, 518, 504 F.2d 1138, 1142 (1974).

Stephen A. Seall, Thornburg, McGill, Deahl, Harman, Carey & Murry, South Bend, Ind., with whom was James F. Thornburg, South Bend, Ind., of counsel, for plaintiff.

Donald P. Lan, Jr., Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

COLAIANNI, Judge:

Sollitt Construction Company, Inc. (Sollitt or plaintiff) in this action alleges that federal income taxes were erroneously assessed and paid with respect to its taxable years ending March 31, 1972, March 31, 1973, and March 31, 1975. Plaintiff maintains that a debt, the retainage owed to it, in the amount of $217,890, under a contract for the construction of the Sacramento Plaza Apartments (SPA), which sum was originally taken into income under plaintiff's completed contract method of accounting, became worthless as of March 31, 1975, and was thus properly deducted as a bad debt in that year under § 166 of the Internal Revenue Code of 1954. The Government argues that the debt was not worthless as of the end of the company's fiscal year and that Sollitt should therefore not be allowed a bad debt deduction, in whole or in part.

Based on the facts of this case as described below, I find that the debt was worthless and that Sollitt may recover for improperly assessed taxes.

### Facts

Sollitt is a corporation organized under the laws of the State of Indiana having its corporate offices and principal place of business in South Bend, Indiana. Sollitt is engaged in a nationwide construction business. This controversy arises out of a contract entered into on January 2, 1973, between Sollitt and SPA, a California limited partnership and owner of the project, for the construction of an apartment project in San Francisco, California.

Leo S. Wou (Wou) was the general partner of SPA and Wou and his wife were its only limited partners. Harold S. "Hal" Toppel (Toppel) was the mortgage banker who arranged interim financing for the project and who eventually went to work directly for Wou. Mortgage financing for the project was provided by First Home Investment Corporation of Kansas, Inc. (First Home), which was to serve as both

the construction period lender and the ultimate mortgagee. Toppel placed the mortgage financing in question with First Home after he was unsuccessful in locating a financial institution in the San Francisco area which would make the loan commitment.[1] The United States Department of Housing and Urban Development (HUD) was the mortgage guarantor, and as such acted as an insurer to the mortgagee for the face value of the mortgage in the event that the mortgagor defaulted. Under the loan commitment, First Home agreed to lend SPA funds for the project at the rate of 7 percent per annum, and the principal value of the loan was to be repaid over 40 years.

The contract with SPA provided that Sollitt would receive payment equivalent to the actual cost of construction, not to exceed $1,870,000, plus 6 percent of the actual cost, not to exceed $112,200. Progress payments were to be made to Sollitt monthly, after Sollitt and the project architect determined the percentage of work actually completed each month. All requisitions for progress payments were channeled through inspectors to the FHA and then submitted to the lender for payment. The lender then disbursed funds to SPA who in turn remitted the amount due to Sollitt. Under the terms of the contract, Sollitt was entitled to 90 percent of the contract value of that portion of the construction completed each month. The balance under the contract, the 10 percent retainage, was payable to Sollitt within 30 days of the completion of the project.

The initial endorsement, which marks the point at which HUD issues a policy to insure the lender's construction loan to the project owner, took place in January of 1973. At that time, the lender submitted a statement, called a mortgagee's certificate, describing the financial transaction between the lender and the project owner. Sollitt began construction on the project in early February 1973.

On April 22, 1973, First Home filed a petition in bankruptcy under Chapter XI of the Bankruptcy Act. First Home was forced into reorganization by the SEC as a result of alleged improper actions of one of its officers. Even though First Home's assets substantially exceeded its liabilities, its assets were for the most part committed and highly illiquid, and it was thus experiencing a serious cash-flow problem.

Shortly after work began on the project, Sollitt ran into a series of construction-related problems, none of which were its fault. However, Wou refused to allow Sollitt extensions of time for completion of the project or increases in construction costs, even though there were provisions in the construction contract requiring such accommodations. Instead, Wou threatened Sollitt with a claim for liquidated damages for each day the project's completion was delayed. As a result, Sollitt elected to have the dispute settled by arbitration as provided in the contract.

During 1974, Sollitt became aware that Wou was encountering financial difficulty, including problems with another HUD-financed project known as Pacheco Village. The construction company involved had filed a claim in connection with that project for an amount exceeding $500,000. Wou was the general partner, as well as the only limited partner, of the Pacheco Village project.

During the summer and fall of 1974, Wou became the owner of yet another HUD-financed project. Wou asked Sollitt to serve as the general contractor on the project, but Sollitt refused because of Wou's financial condition. Wou personally called Sollitt's vice-president and manager of its San Francisco office, Walter Niles, to plead for assistance, acknowledging that he was in serious financial trouble and describing in detail the personal hardship he and his family were experiencing.

Wou's firm had maintained an attractive office in a prestigious business section of

---

1. The initial mortgagee of record under the HUD commitment for insurance of advances, dated December 22, 1972, was Advance Mortgage Corporation, but Advance Mortgage Corporation assigned all of its interest in the commitment to First Home on January 12, 1973.

San Francisco during the contract negotiations and early phases of construction of the SPA. Sollitt became aware in 1974 that Wou had drastically reduced the number of personnel he employed, moved his offices into the SPA project and, together with his wife, begun to personally manage and lease the apartments from these offices. Wou had also apparently attempted to help his financial problems by exploring the possibility of selling part of the SPA. However, he was unable to find anyone interested in buying into the project. It was also about this time that Sollitt management noticed that Wou began avoiding business meetings and communications involving problems with the project.

The next indication of the financial condition of Wou and SPA was their failure to pay $23,375 on the June and July 1974 mortgage interest installments. First Home waited, because of the terms of their agreement, until August 15, 1974, to declare Wou's failure to pay a default. The notice of default was filed by First Home with the San Francisco area office of HUD. To cure the default on the mortgage payments, Wou asked Sollitt for a loan of part of one of its progress payments. Sollitt refused to cooperate in this arrangement. Ultimately, Wou was able to draw against a letter of credit with the Wells Fargo Bank, N.A., to cure the default and reinstate the mortgage. The letter of credit, in the amount of $52,000, was to provide working capital for the project.

In October 1974, Wou and SPA were again unable to pay the interest installment on the mortgage and they again asked Sollitt to allow a part of its monthly progress payment to be used to cure the delinquency. At this point Wou and Toppel told Sollitt that First Home had said it would not disburse additional funds until the delinquent interest payments were brought up to date. They also told Sollitt that First Home would file a notice of default and would begin procedures for assigning the loan to HUD if the deficiency was not promptly corrected. Toppel also told Mr. Niles that neither Wou nor SPA was able to make any financial arrangements to cure the deficiency.

Sollitt was represented at this time by the firm of Pettit, Evers and Martin. Ronald Pengilly of that firm advised Sollitt's president, Richard Gagnon, in an October 28, 1974, letter, that if the default under the loan agreement was not cured by Wou, the loan would have to be assigned to HUD, and Sollitt's retainage, which was being held by First Home, would be in jeopardy.

A second notice of default dated November 4, 1974, was issued by First Home on the delinquent October interest payment in the amount of $13,868. The notice of default was filed with the San Francisco area office of HUD. At that time, First Home's agent, Molton, Allen & Williams, told HUD that reinstatement of the mortgage was doubtful and that a decision concerning the assignment of the mortgage to HUD would be made by November 15, 1974.

Procedurally, notices of default and elections to assign mortgages are typically filed with the area office of HUD having jurisdiction over the project. This is done to give the area office an opportunity to solve any financial problems on a project and reinstate the mortgage before a notice of default and election to assign are forwarded to the national office of HUD in Washington, D.C. However, there is no requirement, under the regulations governing assignments that the lender first file with the local office of HUD. Instead, the regulations permit the lender to file such materials with HUD's headquarters in Washington, D.C.

One way out of this dilemma was for Wou to seek an increase in the mortgage. In a memorandum dated November 5, 1974, Niles informed Sollitt's president, Gagnon, and its attorney, Pengilly, that Wou and Toppel were reluctant to seek an increase in the mortgage in order to resolve the financial problems they were experiencing on the project. While Wou could have used the money that a mortgage increase would have brought, it was felt, on the basis of an economic appraisal of the property, that the project could not justify or support the debt

service on a larger loan. Since, according to Sollitt's attorneys, the failure to bring the mortgage current would result in an assignment to HUD and probable loss to Sollitt of its retainage, Sollitt agreed on November 15, 1974, to permit $10,676 of one of its progress payments to be applied toward the October interest installment. Plaintiff's assistance cured the second default on November 18, 1974, and First Home reinstated the mortgage on November 25, 1974. Sollitt's contribution was treated as a loan to SPA.

Other information concerning Wou's financial difficulties also came to plaintiff's attention. During the latter part of 1974, Wou began to fall behind on his payments to several of the direct contractors on the project. In addition, plaintiff learned in December of 1974 that an attorney, defending Wou against plaintiff's arbitration proceeding, refused to continue to represent him and SPA because of their failure to pay his past fees of approximately $10,000.

Although the SPA was not completed until January 15, 1975, temporary occupancy certificates were issued for the project in December of 1974. Notwithstanding this headstart allowed Wou, rentals were sluggish, and the project experienced a high vacancy rate. The high vacancy rate was due to a variety of reasons, including poor economic conditions, decreased demand in the rental market in the area, and the high rents being asked for the units. In an attempt to alleviate the impact of these factors, SPA offered free parking to new tenants, thus effectively reducing the monthly rental rate by $20.

Even with the temporary occupancy permits allowed Wou, he and SPA continued to miss mortgage payments. They were again deficient in December of 1974 and January and February of 1975. Wou and Toppel once more turned to plaintiff for help, but this time they requested that plaintiff assist in bringing the mortgage current by allowing SPA to use part of its retainage.[2] Wou and Toppel told Sollitt of Wou's poor financial condition and need for money. Wou also, during this time, made repeated threats to Sollitt to file for bankruptcy.

Kenneth M. Levy, a California attorney who specializes in FHA and HUD mortgage financing, and a former HUD associate regional counsel for FHA matters, was originally consulted by Sollitt in connection with the second notice of default by Wou and SPA. As a result of plaintiff's concern over the retainage owed to it, plaintiff again turned to Mr. Levy for assistance. Levy knew of Wou's financial situation because he had been involved in various projects with Wou. Mr. Levy had in fact accepted a limited partnership interest in Pacheco Village in partial payment for his services, but a concern over the economic viability of the Pacheco Village project caused Levy eventually to sell his interest back to Wou.

On March 5, 1975, hearings began in the arbitration filed by Sollitt in May 1974. Wou's financial plight was further demonstrated by his representation at that time that he would be unable to afford the costs involved in conducting the arbitration including an attorney for himself, a court reporter, room rental or his share of the per diem for his arbitrators.

On March 12, 1975, a meeting was held to effect final endorsement of the Sacramento Plaza Apartment project. Such a meeting is typically held after the completion of construction on a given project. This meeting had originally been scheduled for late February, but had to be postponed because SPA's mortgage interest installments were not current. At the final endorsement, a contractor's retention is usually released. Although HUD requires that title to the project be lien-free at final endorsement, this requirement is usually satisfied by the purchase of a suitable bond. Present at this meeting were Sollitt, represented by, among others, Messrs. Levy, Niles, and Pengilly; First Home, represented by Julius Turek (Turek), an attorney with Holton,

---

2. This was possible because construction of the project was completed on January 15, 1975, and plaintiff was, under the terms of his contract, entitled to his retainage at the closing for the project mortgage which was originally scheduled for late February 1975.

Allen & Williams, Inc., and his associates; SPA, represented by Messrs. Wou and Toppel; and HUD, represented by John Kavanagh, its leading housing attorney in the San Francisco area office, and others. Also present were representatives of a title insurance company.

Of the $218,042.13 still in the hands of First Home on March 12, $217,889.94 represented monies due to Sollitt under the retainage clause. All conditions precedent to the turning over of the retainage had been satisfied by Sollitt as of March 12, 1975. At the meeting, Sollitt agreed that it would be willing to allow $66,049.18 of its retainage to be withheld to bring SPA's mortgage interest payments current. This amount was to be treated as a loan by Sollitt to SPA.

The offer by Sollitt to bring the mortgage current was rejected by First Home, and the mortgage company refused to release any of the monies still in its possession under the terms suggested by Sollitt. Instead, First Home for the first time demanded that Sollitt, in addition to curing the deficiencies in the interest payments, satisfy a $35,176.35 personal note it had from Wou for a permanent loan discount on the project, and a $29,928 extension fee owed to First Home by Wou in connection with another of his projects. Even more, Wou and First Home demanded that funds from Sollitt's retainer be used to satisfy liens against the project property,[3] with the remaining funds being placed into an escrow account pending the outcome of the arbitration claims between SPA and Sollitt.

Sollitt agreed to allow its funds to be used to bond off the liens, which totaled approximately $36,134, for which it might be liable. However, the demands to satisfy Wou's personal debts of $35,176.35 and $29,928.90 were refused by Sollitt. Plaintiff was upset because of First Home's and Wou's failure to disclose the existence of these personal debts as they were required

to do. Particularly, the mortgagee's certificate submitted by First Home at the initial endorsement, required the disclosure of these types of charges at the outset of the project. These specific items, however, were never disclosed by First Home and their existence came as a complete surprise to Sollitt at the final endorsement meeting. Sollitt's attorneys told it that the demands by First Home for payment of these items were illegal.

When Sollitt refused to meet First Home's conditions, the mortgagee walked out of the meeting, refusing to release the funds remaining from the loan, including plaintiff's retainage. That same day, First Home filed a third notice of default and an election to assign the mortgage to HUD with both the HUD area office in San Francisco, and with the national office in Washington, D.C.

Subsequent to the aborted final endorsement meeting, HUD officials quickly initiated a series of activities designed to correct the problems raised by the parties at the closing and prevent the assignment of the mortgage to HUD. On March 12, Mr. Kavanagh of HUD who was the closing attorney on the project and the one who had received the notice of default and election to assign, met with the First Home representatives. Mr. Kavanagh testified that he was angry that the final endorsement had broken down because of the demand of First Home that Sollitt pay for items not reflected in the mortgagee's certificate. Mr. Kavanagh was very concerned about protecting HUD's insurance fund, which would be obligated to fully compensate First Home if it assigned the mortgage to HUD. Thus, he suggested that First Home might be able to collect the monies which were owed to it and at the same time effect final endorsement if Wou's and SPA's mortgage was increased by an amount adequate to cover the indebtedness. Kavanagh

---

3. Other than the deed of trust securing the mortgage and city and county taxes, the liens on the project as of the March 12, 1975, meeting of final endorsement were filed by Pacific Excavators, who performed work on the project and was hired as a subcontractor by Sollitt, and Commercial Cabinet Corporation of America, which was hired as a direct contractor by SPA.

testified that Turek responded to the suggestion of a mortgage increase by assuring him that First Home would cooperate in obtaining the increase and that it wanted to effect final endorsement. However, Kavanagh was not informed at that time that First Home had filed or was about to file a notice of default and election to assign with the national office of HUD. To the contrary, he testified that he was told that no such filing would be made. Kavanagh testified that he believed from discussions with other HUD officials in the San Francisco office that if the project were properly managed, its prime location could justify an increase in the mortgage. Kavanagh wasted no time in informing staff members in the office that a mortgage increase was necessary, and they immediately began to process the increase.

By March 13, 1975, Sollitt and its attorneys were aware that First Home had filed an election to assign the mortgage with the HUD office in San Francisco, but the evidence is conflicting as to exactly when Sollitt was put on notice that Mr. Kavanagh and HUD were going forward with attempts to obtain a mortgage increase. Kavanagh maintained that he informed Sollitt's attorney, Levy, either the day of or the day after the aborted closing. Levy, however, testified that he did not have notice until March 19, 1975, and that Toppel of SPA told him. Support for Levy's testimony is found in a pair of letters that were written by Mr. Levy during the period in question. In a March 26, 1975, letter Mr. Levy wrote to the area director of the San Francisco area office of HUD asking—

> [I]f you will not entertain a proposal for a loan increase, * * * please notify me of your ultimate decision prior to the forwarding of the Notice of Election to Assign to Washington, so that my client will have the opportunity to continue to pursue this matter further with your Washington office.

While the exact day that he learned about the attempts to increase the mortgage is in dispute, the above quotation from the March 26 letter shows that Levy was aware of Kavanagh's efforts to obtain a mortgage increase prior to the close of Sollitt's fiscal year on March 31, 1975. Also, Levy and Sollitt did not know by March 31, 1975, that First Home had filed a separate election to assign the mortgage with the HUD office in Washington.

While the status of First Home's election to assign, which was pending in the San Francisco office of HUD during the period in which that same office was considering a mortgage increase, is equally unclear, a March 19, 1975, letter from Levy to Mr. Toppel of SPA indicates that plaintiff knew it was still under consideration as of that date. Under HUD regulations, a mortgagor has a 30-day grace period in which to cure a default under a financing contract in the event of a failure to make a payment. If a default lis cured within the 30-day grace period, reinstatement of the mortgage is automatic. If the default is not cured within that time, the mortgagee has the next succeeding 45 days in which to notify HUD that it is electing to assign the mortgage. Upon a timely assignment of the mortgage, the mortgagee is entitled to receive payment in the face amount of the insured mortgage from HUD. In this case, the failure of SPA to make mortgage payments in December of 1974 and January and February of 1975 constituted a default by March 12, 1975. First Home timely filed a notice of default and an election to assign. Having made an election, First Home, the mortgagee, could not be required by HUD either to reinstate the mortgage or to increase the amount of the mortgage on the project, although it was not precluded from voluntarily doing so.

Even though a mortgage loan increase need only be reviewed and approved at the local HUD area office and not by the national office in Washington, D.C., it takes approximately 60 days to process it. However, any such increase cannot be made without the approval of the mortgagee. In the usual case, approval of the mortgagee is never in question because the process is normally initiated by an application from the mortgagee. In this case, the San Fran-

cisco area office began processing the mortgage increase before it obtained a formal application from First Home. One of the witnesses from HUD testified that it was common practice for HUD to begin work on a mortgage increase for financially troubled projects before a formal application was made by the lender. However, defendant did not produce at trial any formal application by First Home requesting a mortgage increase for the SPA project, and it is not clear that one ever existed.

In instances where an election to assign is filed with a local HUD office, that office has a "reasonable time" in which to process the assignment and forward it to headquarters in Washington. HUD regulations do not establish a deadline for the forwarding of an election to assign. In the case of First Home's March 12, 1975, election to assign, Kavanagh testified that he held on to the paperwork for several weeks before finally forwarding it to the chief of all housing divisions at the San Francisco area office. The chief signed the forms on April 3, 1975, and, in turn, routed them to a processing control clerk in the office, who ultimately forwarded them to Washington, D.C., on April 22, 1975. In the absence of consent by First Home to a mortgage increase, the HUD office in San Francisco had no discretion but to process the assignment.

In his testimony, Kavanagh maintained that the notice of default and election to assign were being held by him pending a decision concerning the mortgage increase. He stated that he had been assured by Mr. Turek of First Home that the lender was going to cooperate in obtaining an increase and that it would not pursue the election to assign until it was determined that a mortgage increase would be rejected. However, HUD regulations clearly establish that HUD could not force a mortgagee to accept a mortgage increase. Not only is there nothing in the record which shows that First Home ever requested Kavanagh to initiate an investigation into whether the project could support a mortgage increase, no witness from First Home appeared at trial to testify that First Home had orally

assured Kavanagh that it would cooperate in getting a mortgage increase.

During the several days immediately prior to March 25, Toppel of SPA was in contact with Messrs. Kavanagh, Levy and Turek about the possible loan increase. In a letter to a Mr. Wong of HUD's area office, Toppel informed him of his conversations with the parties and of Turek's apparent willingness to cooperate by not imposing a substantial discount on the mortgage increase amount. Toppel also noted that he (Toppel) was in the process of preparing documentation to justify an increase. Levy received a copy of this letter.

After the aborted March 12 closing, Kavanagh suggested to Levy that he write some letters explaining the problems surrounding the closing in order to exert pressure against the assignment of the project. Levy wrote letters to both First Home and Mr. James Price, Director of HUD's San Francisco area office, on March 13.

In the previously referred to letter of March 19, 1975, Levy informed SPA that any differences between SPA and Sollitt could be worked out and suggested that they should both try to block First Home's election to assign before it reached the Washington office. At about the same time SPA was assuring Kavanagh that First Home was willing to pursue the increase, but SPA pointed out to him that it would probably be unable to carry the debt load of an increased mortgage without increasing rents. Although the evidence does appear to establish that SPA, Sollitt, and Kavanagh of HUD seriously considered the possibility of a loan increase after the aborted closing, Turek of First Home wrote a letter on March 18, 1975, informing the other parties that the mortgagee was proceeding to assign the loan to HUD in accordance with its contract provisions.

Further complicating the process was the fact that any loan increase approved by HUD would have been under the same terms as the original mortgage to SPA, which was for 40 years at 7 percent interest. Thus, First Home would have had to

agree to loaning SPA additional money at a 7 percent annual rate at a time when the prevailing interest rate was 12 to 15 percent. In its evaluation, HUD followed its usual investigative procedures and concluded that the project qualified for an increase because of the "soft costs" which had arisen in the course of construction. Moreover, once HUD concluded for whatever reason that a loan increase was justified, the authorized funds could be used to cure whatever defects stood in the way of final endorsement.

James Liska (Liska), of HUD, was responsible for deciding whether to approve a loan increase and in what amount. Immediately following the aborted March 12 closing, Liska began evaluating the feasibility of the increase. Under HUD regulations, no mortgage increase would be allowable unless the project was "economically sound," i.e., the project would be able to support the increase.

The amount of the proposed mortgage increase was preliminarily estimated at $76,000. Liska considered the preliminary estimate as being a conservative figure and one which in all probability could have been increased. However, any increase had to be tied to, and was limited by, the debt service on the project. Liska's staff reevaluated the project and determined that a rent increase of between $10 and $40 per unit would be necessary in order to carry the mortgage increase. It was not until April 22, 1975, that the staff informed Liska they believed the mortgage increase could be approved.

In addition to curing other defects, any increase in the mortgage loan would also have to be used to cure mortgage installment deficiencies incurred by the project after the aborted March 12, 1975, closing. These deficiencies were accruing at the rate of approximately $15,000 per month. The Kavanagh-SPA plan to get the project through final endorsement appears to have relied not only on the additional monies that would be made available through a loan increase, but also upon Sollitt's agreement at the March 12 closing to lend SPA $66,049.18 to cure defaults and seal off outstanding liens.

### Events Occurring After March 31

While the legal effects of events which occurred after the March 31 fiscal year of plaintiff are of arguable value in evaluating the reasonableness or unreasonableness of plaintiff's action, they are included in the interest of completeness.

Subsequent to the end of plaintiff's March 31 fiscal year, and continuing to the end of the 1975 calendar year, the vacancy rate of the Sacramento Plaza Apartments began to drop. Nine months after the aborted closing, the project had achieved an 85-percent occupancy rate. While the record is unclear, the units were presumably being rented at the rates established by Wou at the outset, discounted by the $20 per month parking fee.

Ironically, on April 22, 1975, the same day that the San Francisco office was informing Mr. Liska that it believed a mortgage increase would be approved, the national office of HUD authorized First Home to record the assignment of the mortgage from First Home to HUD. First Home recorded the assignment. Acceptance by the national office precluded any further consideration of a mortgage loan increase. The San Francisco office did not know of First Home's election to assign until it received a copy of the April 22, 1975, letter. The San Francisco office immediately sent a memo to the national office advising that a mortgage increase would be approved and that the project would proceed to final endorsement. By coincidence, prior to the receipt of a copy of HUD's April 22, 1975, letter to First Home, the San Francisco office had on April 22 forwarded the notice of default and the election to assign filed by First Home in San Francisco to HUD's national office in Washington, D.C. Although, as previously mentioned, regulations did not require the area office to forward an election to assign within a specified time, but allowed it to be held for a reasonable time while trying to work out a reinstatement of the mortgage and effect final endorsement,

Kavanagh felt that he had "pushed it pretty much to the limit" in holding it until April 22. No mortgage increase was ever approved by the San Francisco office of HUD.

On April 25, 1975, HUD paid $1,753,-249.98 in partial settlement of First Home's claim for insurance benefits. On July 21, 1975, HUD made a payment of $716,678.79 and on September 11, 1975, it made the final payment of $4,751.86. Upon acceptance of the assignment of the mortgage to HUD, HUD received the $218,042.13 of the undisbursed mortgage proceeds which was still being held by First Home. These monies were in part eventually applied in payment of the past due interest installments on the mortgage through February 1, 1976. In July 1976 HUD applied the remainder of the undisbursed proceeds to a tax escrow account because the monthly amount being escrowed for this purpose was insufficient to satisfy the tax liability on the project.

Both Levy, on behalf of plaintiff, and Toppel, on behalf of the SPA, wrote to the HUD office in Washington in April 1975, when they learned that First Home had filed an election to assign in the national office, to protest the conduct of First Home at the aborted closing, and to ask for an investigation. Levy continued to protest after he found out that the election had been accepted by headquarters during a time that the area office was still considering the increase.

The national office acknowledged the protests and indicated that an investigation would be conducted. However, nothing happened to change the fact that HUD had accepted the assignment from First Home on April 22. Levy also wrote then-secretary of HUD Carla Hills asking that the project not be foreclosed and that an investigation be conducted and final endorsement be provided for. On May 20, the national office wrote that no foreclosure would take place until a report was received from the San Francisco office on the matter. However, Levy was told that the recordation of the assignment precluded final endorsement unless the mortgage could be reassigned to First Home.

On June 2, Levy asked the director of the San Francisco area office to request that steps be taken to see that all project income and expenses were properly accounted for and made available to cure the mortgage delinquencies in the event that the project went to final endorsement. Levy was informed that if the project was assigned to HUD, Sollitt might not receive the full amount of the retention.

Sollitt continued to protest through its president, who wrote to Congressman John Brademus of Indiana, asking for an investigation. HUD advised Levy that it would consider releasing the mortgage funds to SPA if the deficiencies were cured and the liens on the project removed. A "workout" arrangement was attempted to consummate final endorsement, which essentially allowed for the capitalization of the mortgage deficiencies and amortization over the life of the loan. Any such arrangement had to be approved by the national office of HUD. Wou believed that the project income could sustain the debt service under the proposed plan, but the plan was rejected by the national office on January 13, 1976.

As previously mentioned, the national office subsequently authorized the application of the undisbursed mortgage proceeds to cure the delinquencies as of February 1, 1976, and directed that the remaining funds be held in escrow for release to Sollitt pending Wou's consent. Sollitt was informed that it could only expect to realize approximately $50–$77,000 of the retainage monies held by First Home. Wou executed a consent, but in April the national office told Sollitt that the funds would not be released until the outstanding liens on the project were removed.

By June 24, 1976, most, if not all of the liens had been removed by SPA. Thus, it asked the national office to release $25,000 to Sollitt from the escrow account. On October 4, 1976, Levy was informed by the San Francisco area office of HUD that there were no funds remaining in the escrow account and plaintiff never received any of these funds.

Even though plaintiff declared the retainage to be a bad debt in 1975, its president explained at trial that company policy required it to pursue all creditors regardless of the prospects of collection. In addition, because of the company's sense of outrage at the actions of Wou, SPA, First Home and HUD, plaintiff also considered bringing an action against HUD to recover its retainage. However, Sollitt was told that since it was not in privity of contract with HUD, it could not sue HUD to prevent the use of the escrow funds or to recover a portion of the retainage.

A decision in plaintiff's arbitration proceeding against SPA came down on May 5, 1975, and Sollitt was awarded 231 extra days in which to complete the SPA project and $51,021 compensation for owner-induced changes and other items. The 231 extra days were adequate to allow Sollitt to complete the project without incurring delay damages. Under California law, the arbiter's award had to be confirmed by a court to establish the judgment against SPA and Wou for the amount of the award. Thus, on June 16, 1975, Sollitt filed an action in Superior Court, requesting the court to confirm the arbiter's award and grant an allowance for costs expended in obtaining and confirming the order.

On June 15, 1975, Sollitt instituted a suit in United States District Court against the Wous personally for the retainage under the construction contract, for the amount due under the arbitration award, and for any interest it might have claimed. Wou and SPA filed a counterclaim in the District Court action for water damages due to defective construction of the project. Sollitt was concerned about a California law which permitted contractors to be sued for defective construction by persons with whom it was not in privity under the original contract but who may have purchased the SPA project from the Wous or others at a distant point in time. In order to obtain a release for construction defects on the project, and also because it believed that the costs of litigation would be greater than any judgment which could have been collected from defendants, Sollitt agreed to stipulated judgments with SPA and Wou in the Superior Court action on July 2, 1976, and in the District Court action on November 5, 1976.

Under the terms of the settlement Sollitt received a $112,500 promissory note from SPA which was payable on March 15, 1979. On April 11, 1980, after two extensions and after he was able to sell the SPA project, Wou paid Sollitt $123,054.66 in full discharge of the note. The sale of the SPA project took place following a period of double-digit inflation that caused a large increase in real estate values throughout the country. The note had been carried on Sollitt's books at no value following the 1976 settlements.

On May 19, 1977, Wou, individually and on behalf of Leo S. Wou and Associates, Community Development Associates, and Development Associates International, filed a petition in bankruptcy.

*Discussion*

The $217,890 retainage which is the subject of this litigation was originally taken into income by Sollitt under its completed contract method of accounting. On its income tax return for the fiscal year ending March 31, 1975, Sollitt reported the retainage as a bad debt deduction under § 166 of the Internal Revenue Code of 1954, as amended.

On or about September 25, 1975, Sollitt filed a timely Form 1120X Amended United States Corporate Income Tax Return, as a claim for refund for its fiscal year ending March 31, 1972. Plaintiff's claim sought a refund of federal income taxes from a carryback to 1972 of the net operating loss reported on its 1975 federal income tax return. Sollitt also filed a timely Form 1120X, Amended United States Corporate Income Tax Return, as a claim for refund of federal income taxes for the taxable year ending March 31, 1973. This claim sought a refund of $983 as a result of the carryover of Sollitt's investment tax credits for prior and subsequent years.

On March 1, 1978, the Commissioner of Internal Revenue allowed Sollitt's claim with respect to its taxable year ending March 31, 1972, to the extent of $60,399 and disallowed its claim to the extent of $89,088. Plaintiff's claim for the taxable year ending March 31, 1973, was disallowed in its entirety. The basis for the disallowances was that the bad debt claimed by Sollitt resulting from the project did not become worthless in the 1975 taxable year.

Sollitt filed a Form 1120X, Amended United States Corporate Income Tax Return, as a claim for refund for its 1975 taxable year, contending that as a result of the carryover to its 1975 taxable year of investment tax credits made available by the carryback to its 1972 taxable year of its net operating loss for its 1975 taxable year, plaintiff is entitled to a $9,077 refund in federal income taxes paid during its 1975 taxable year. Since more than 6 months elapsed after the filing of this claim for refund without formal notice of allowance or disallowance of the claim having been received, plaintiff filed a petition in this court asking for resolution of its claim.

For the fiscal year ending March 31, 1975, Sollitt paid $16,426 in federal income taxes, $2,196.10 in interest thereon, and $468.90 in penalties.

The Internal Revenue Code provides, in pertinent part, that: "[T]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." I.R.C. § 166(a)(1). Plaintiff maintains that a debt in the amount of $217,890 owed to it by SPA became worthless in its entirety during Sollitt's taxable year which ended March 31, 1975, and was thus properly taken as a deduction in that year. The Government contends that plaintiff has not shown the debt was worthless as of March 31, 1975, and that Sollitt was thus not entitled to the deduction under § 166.

This court has over the years maintained that the test for deciding whether or not a debt has become worthless is not a precise and rigid one, but rather one which must, of necessity, take into consideration the facts and circumstances of each case. It is often difficult to isolate a particular identifiable event which triggers the conclusion of worthlessness; "[m]ore often it is a series of events which in the aggregate present a picture establishing that the debt in question is worthless." *Minneapolis, St. Paul & Sault Ste. Marie R.R. v. United States,* 164 Ct.Cl. 226, 240 (1964). This court has endorsed the Tax Court's assessment that a determination of worthlessness requires the exercise of "sound business judgment." *Id.* at 241, citing *Washington Institute of Technology, Inc.,* 10 T.C.M. 17, 20 (1951); *Levin v. United States,* 220 Ct.Cl. 197, 209, 597 F.2d 760, 767 (1979). In exercising this judgment, the taxpayer must strike a balance between optimism and pessimism using as complete information as is reasonably obtainable. *Id.* at 241. *Levin v. United States,* 220 Ct.Cl. at 209, 597 F.2d at 767.

In commenting on the factors which are relevant in establishing the worthlessness of a debt, the regulations accompanying § 166 advise:

Section 1.166–2. *Evidence of worthlessness.*

(a) *General rule.* In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor.

(b) *Legal action not required.* Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166.

Treas.Reg. § 166–2(a)–(b) (1960).

■ The Supreme Court has interpreted the statutes and regulations governing the determination of worthlessness to require that "[a] loss, to be deductible, must have been sustained *in fact* during the taxable year." *Boehm v. Commissioner,* 326 U.S. 287, 292, 66 S.Ct. 120, 123, 90 L.Ed. 78

(1945). The test, therefore, is an objective one and the trier of facts, in evaluating the validity of the deduction in a particular year, is not limited to an examination of the particular taxpayer's beliefs and actions, although such conduct may be considered. *Id.* A determination of worthlessness "of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration regardless of their objective or subjective nature." *Id.*

■ This court has concluded that hindsight should not be used in evaluating the possibility of collection of a debt. Rather, a court should look at the facts known at the time that the debt was declared to be worthless. *Minneapolis, St. Paul & Sault Ste. Marie R.R. v. United States,* 164 Ct.Cl. at 241; *Cherrydale Cement Block Co. v. Commissioner,* 21 T.C.M. 1408, 1410 (1962). However, subsequent events are not totally irrelevant for, while they may not be used in the determination of worthlessness, they may be used to examine the soundness of plaintiffs' judgment in reaching its conclusion. *Id.; Peyton Du-Pont Securities Co. v. Commissioner,* 66 F.2d 718, 721 (2d Cir. 1933).

■ Moreover, the fact that a debt which has previously been declared to be worthless is later collected in part, does not make that deduction improper in the year it was taken. *United States v. S.S. White Dental Mfg. Co.,* 274 U.S. 398, 402–03, 47 S.Ct. 598, 600, 71 L.Ed. 1120 (1927). Nor do efforts to collect the debt invalidate taxpayer's deduction. *Green v. Commissioner,* 35 T.C.M. 569, 572 (1976). It is, of course, necessary to show that a reasonably prudent businessman would have determined the debt to have been worthless at the end of the taxable year. The initiation of suit is also not required to demonstrate that recovery efforts have been exhausted, if the taxpayer establishes "that such an action, when considered in the light of objective standards, would in all probability have been entirely unsuccessful." *Dustin v. Commissioner,* 467 F.2d 47, 48 (9th Cir. 1972).

The "reasonable prospect" of recovery that precludes a declaration of worthlessness has been interpreted to require a chance of recovery somewhere in the range of 40–50 percent, and the mere possibility of recovery is not enough. *Parmalee Transportation Co. v. United States,* 173 Ct.Cl. 139, 154–56, 351 F.2d 619, 627–29 (1965). The existence of a possible claim or pending litigation alone does not, according to the court in *Parmalee,* necessarily mean that the probability threshold had been met, and that the taxpayer should have postponed declaring the debt to be worthless. That court found that there were many reasons why the taxpayer might bring suit and noted that "[w]here the stakes are so high, a suit may be '100% justified' even though the probability of recovering is miniscule * * *. A lawsuit might well be justified by a 10 percent chance." *Id.* at 154, 351 F.2d at 628.

This court has also long maintained in discussing worthlessness under I.R.C. § 165, which provides for deductions for uncompensated losses, that a taxpayer's decision should be sustained "unless it appears from the facts that the decision as to the year of loss was unreasonable or unfair at the time the decision was made." *A.J. Industries, Inc. v. United States,* 181 Ct.Cl. 1017, 1020, 388 F.2d 701, 704 (1967), *cert. denied,* 393 U.S. 833, 89 S.Ct. 104, 21 L.Ed.2d 104 (1968).

■ Of course, the burden is on the taxpayer to show that it did not have a reasonable prospect of recovery at year end, and that the debt therefore became worthless in a particular year. *Boehm v. Commissioner,* 326 U.S. at 294, 66 S.Ct. at 124; *Levin v. United States,* 220 Ct.Cl. at 208–09, 597 F.2d at 767.

■ In order to decide whether the debt owed to Sollitt became worthless, as plaintiff contends, it is necessary to examine the facts and circumstances known to plaintiff as of March 31, 1975, the end of its fiscal year. This evaluation logically begins with an attempt to establish Wou's personal financial condition and the financial condition of SPA as of March 31, 1975. Wou and his

wife were SPA's only limited partners and Wou was, as well, its general partner. Thus, SPA and the Wous provided the only source of satisfaction for the retainage and other construction-related debts owed to Sollitt. Since Sollitt was not in privity of contract with HUD or First Home, it is doubtful that it could have brought an action against either of them to recover the retainage. Sollitt was further hampered by a "no-lien" clause in the contract, whose validity had been upheld in federal district court, that prevented the plaintiff, as the contractor of SPA, from placing any liens against the project.[4]

The trial record clearly establishes that Wou had been having serious financial difficulties for some time prior to March 31, 1975. Wou's difficulties involved not only the Sacramento Plaza Apartment Project, but also other business and personal aspects of his life. The existence of these problems eventually became common knowledge in the San Francisco business community. By the time of the aborted closing, Wou was involved in a lawsuit with another contractor over a HUD-financed project. Wou was in such financial straits that his lawyer withdrew because Wou had failed to pay his fees. Wou even implored Sollitt to act as general contractor on this other construction project, explaining that he would have to sell a residence and take his children out of private schools if his financial condition did not improve. So desperate were his finances that he often considered bankruptcy.

As time went on, Wou moved from his prestigious business offices to the apartment complex, cut his office staff, and he and his wife took over the management and rental operation of SPA. Shortly before the aborted closing, Wou showed up at an arbitration hearing involving the property without an attorney and represented that he could not afford to pay for his share of the costs of conducting the hearing.

Conditions at the SPA project were equally as desperate during this period of time. The project was literally insolvent in that it was not paying its debts as they became due. SPA had frequently defaulted on its mortgage payments and the mortgage had been reinstated on two different occasions. On one occasion, Wou liquidated a letter of credit which was intended to provide operating capital for the project in order to have the mortgage reinstated. On a second occasion, SPA had to borrow from Sollitt to bring the mortgage current.

The project was suffering from a high vacancy rate due to the soft rental market that plagued the entire San Francisco area, as well as from the high rents being charged for the units. To try to increase rentals, Wou had offered tenants free parking, rather than charging the established $20 parking fee. This effectively reduced rents by $20 per unit per month. Wou also at one point represented to a Sollitt officer that he was unable to raise money by selling the project because no one would buy into it. Sollitt's attorney Levy, who had considerable experience with the housing market in San Francisco, testified that he believed that the fair market value of the project was less than the value of the mortgage.

It was in this financially plagued setting that Sollitt went to the March 12, 1975, project closing. At this time, SPA was again in default on its interest payments and Sollitt knew these would have to be satisfied prior to final endorsement. In order to protect its retainage that was in the hands of First Home and would be turned over by First Home upon assignment of the mortgage to HUD, plaintiff was prepared to loan Wou enough to cover its overdue interest payments. However, the mortgage company at that meeting asked Sollitt to also take care of some $65,000 worth of personal loans between Wou and First Home before it would agree to final endorsement. Sollitt refused to do so, and the closing aborted.

Immediately after the abortive closing, First Home filed a notice of default and

4. Notwithstanding the existence of the "no-lien" clause, plaintiff on March 21, 1975, recorded a claim of lien in the amount of $374,-747.94.

election to assign with the San Francisco area office, and unbeknownst to Sollitt, SPA or the area office, with the national office of HUD as well. Sollitt had been advised by counsel that there would be little hope of recovering the retainage if the assignment of the mortgage were accepted, a concern which the defendant acknowledges in its brief was a legitimate one. Thus, at this point, unless Sollitt agreed to take care of Wou's personal loans, it could not expect to prevent the assignment, effect final endorsement, and recover the retainage. In case of a default, the San Francisco area office would have been required to process the election to assign, and HUD would have been bound to pay First Home the face value of the mortgage upon acceptance of the assignment. Mr. Kavanagh of the San Francisco office was not pleased with this prospect since it would reduce the amount of monies that HUD would have to work with by over $2 million. He was, therefore, eager, along with Wou and plaintiff, to see if anything could be done to effect final endorsement.

It was indeed Mr. Kavanagh who originally suggested that a mortgage increase might be a solution to the problem, since the increase could be used to pay off Wou's personal debts to First Home. Although Kavanagh's primary interest was to protect the HUD insurance fund, the plan could not have been implemented without the support and approval of both Wou and First Home. He, accordingly, suggested the solution to both parties, and he testified that they agreed to cooperate in the effort.

Sollitt knew that any mortgage increase, to be acceptable under HUD regulations, would have had to have been economically justifiable, that is, the project would have had to sustain an even higher debt service than presently existed. It also knew that the mortgage increase would have had to have been at the same terms as the original loan, or more specifically, a 40-year mortgage at 7 percent. The HUD staff, at Mr. Kavanagh's urging, conducted a reexamination of the project to see if the project could justify a higher mortgage and eventually concluded that the project could probably sustain a $76,000 increase. To support the mortgage increase would have required an increase in rents of between $10 and $40. This conclusion by the HUD staff was in part based on the prime location of the project and the removal of Wou as manager. This estimate, however, did not take into consideration that Wou was forced, months earlier, to give the renters a $20 decrease, through the inclusion of free parking. Regardless of the merits of these predictions, they were not presented to Mr. Kavanagh until April 22, 1975, or long after the close of Sollitt's March 31 fiscal year. These facts, accordingly, could not have influenced plaintiff's decision of worthlessness, since Sollitt had to decide on the probability of an increase based on the information available as of March 31, and the best information available at that time indicated that SPA was not a viable project.

Even if Sollitt had been inclined in late March to take it on faith that HUD would favor a mortgage increase, it would also have had to speculate on the likelihood that First Home would accept the proposal. Sollitt knew that First Home had filed an election to assign its mortgage with HUD's San Francisco office and that its election would eventually have to be processed. This was so even if Mr. Kavanagh was purposely delaying the processing of First Home's papers. Sollitt was also aware of First Home's liquidity problems, the fact that the terms of the mortgage were below current interest rates, and the fact that the mortgagee had experienced continuing problems with Wou and SPA. Thus, Sollitt concluded, and I find not unreasonably, that the SPA loan was a bad investment for First Home, and that there was therefore no reason from a business standpoint for First Home to reinstate the mortgage. Sollitt was also aware of a March 18, 1975, letter from Mr. Turek (of First Home) to Mr. Price, the director of HUD's San Francisco office, since Sollitt received a copy, that clearly indicated First Home's intention to proceed with its election of assignment. Specifically, the letter states:

However, as matters now stand, the mortgagee [First Home] has, in accordance with the regulations, furnished to HUD the requisite documentation pertaining to its election to assign this loan based on the monetary default of the mortgagor [Wou] and *we shall proceed in accordance with the provisions of the insurance contract.* [Emphasis added.]

The only suggestion Sollitt had that First Home was going to cooperate with an increase and not pursue the election to assign was the lender's representations to Mr. Kavanagh of HUD to that effect. Defendant argues that because Sollitt knew that an increase was being attempted and because it was told that First Home had pledged cooperation, it should not have believed that the debt was worthless. This position would have required plaintiff to take it on faith, in evaluating the debt as of March 31, 1975, that First Home would go along with a mortgage increase, in the face of a substantial array of hard evidence which could support a belief that such cooperation would not be forthcoming.

Indeed, if plaintiff had ignored the facts as they existed on March 31, because it wanted to believe that Wou would be given a mortgage increase and because it very much wanted Wou to gain the increase in order to protect its substantial retainage in the hands of First Home, plaintiff could very accurately be accused of being an incorrigible optimist.

Along with all of the above facts, it is also important in trying to establish the reasonableness of plaintiff's action to remember that it was First Home's demands, demands which Sollitt believed to be both "illegal" and "immoral," which precipitated the aborted closing in the first place. It was also First Home that decided to file, with HUD's San Francisco office, an election to assign plaintiff's mortgage to HUD without even wasting a single day after the March 12 abortive closing.

Moreover, First Home, on the same day, filed an election to assign with HUD's national office in Washington, D.C., suggesting that First Home anticipated that final endorsement of the mortgage would never be consummated. All the while Mr. Kavanagh was telling plaintiff and Wou of First Home's agreement to cooperate, First Home never informed either the San Francisco area office of HUD or Sollitt of this other filing. While the knowledge of the Washington filing was not known to Sollitt as of the close of the fiscal year, and thus should not be considered in the determination of worthlessness, it certainly is evidence of the soundness of Sollitt's estimation of the likelihood of First Home cooperating with the mortgage increase. Finally, although Mr. Kavanagh testified that a request for a mortgage increase was required from the lender, First Home, before one could be approved, Sollitt was never directly told before March 31, 1975, that First Home favored a mortgage increase. Inasmuch as no such document was produced at trial, there is no evidence that such a request was ever executed by First Home.

There was also substantial evidence to show that, from a business standpoint, it was in First Home's best interest to assign the mortgage to HUD and collect the almost $2.5 million face amount of the insured mortgage from HUD. It was known to plaintiff that First Home had filed a Chapter XI petition for bankruptcy on April 22, 1973, and that it was experiencing a severe cash flow problem. This was only months after First Home had made the January initial endorsement of the mortgage to Wou and SPA. Also, the terms of the mortgage calling as it did for an almost $2.5 million commitment for 40 years at 7 percent, locked First Home into a financially losing proposition. By March 31, 1975, the prevailing interest rate had risen to between 12 and 15 percent. Thus, plaintiff knew that First Home could be utilizing its monies to bring in almost twice as much interest if the 7 percent SPA mortgage was terminated. Plaintiff could also reasonably assume that money-plagued First Home would have preferred to have its money earning the *highest* rate possible. This arrangement applies equally to any mortgage increase, which would have had to have been on the *same* undesirable terms.

In addition, plaintiff knew that First Home had already set in motion the procedure to assign its mortgage to HUD for the face value of the mortgage by the filing of its notice to assign with the San Francisco office. This meant that if First Home did nothing the SPA mortgage would in due course be assigned to HUD and First Home would be paid off the approximate $2.5 million face value of the mortgage. Plaintiff was aware that First Home would have to take some affirmative action before HUD would authorize the mortgage increase. However, the trial transcript fails to show that First Home ever did anything to alter the course begun on March 12, 1975, with the filing of its election to assign. Indeed, except for Mr. Kavanagh's testimony that he had received the assurance of First Home that it would cooperate with a mortgage increase, the trial record fails to disclose either written assurance or oral testimony from anyone at First Home regarding its "commitment" to see that the SPA project went to final endorsement.

From plaintiff's point of view, and with the possibility of gaining some insight into the reasonableness of plaintiff's declaration of a bad debt, it is clear that Sollitt had no hope of effecting the final endorsement and recovering its retainage without the mortgage increase. Thus, the remoteness of the increase would be an important factor in understanding plaintiff's March 31 action. Objectively, it appeared that the project was unable to even support the existing mortgage payments. Certainly, plaintiff knew that Wou and SPA had defaulted on the mortgage on two previous occasions, and was in default the third time at the final endorsement. Plaintiff also knew that the reason for these defaults was that Wou was having trouble renting the units at the prices necessary to sustain the debt service of the current mortgage. Thus, plaintiff could have reasonably been suspicious of representations that the project would have been able to support the even higher debt service that would have resulted from a mortgage increase.

It is in this above-described setting that plaintiff on March 31, 1975, was forced to decide the probabilities of recovering on the debt owed to it by SPA. I find that the evidence reasonably supports Sollitt's judgment that there was no substantial likelihood that the debt would be satisfied by any source. The legal and economic realities as of March 31 were such that Sollitt could justifiably conclude that the prospect of a mortgage increase being approved by HUD, and accepted by the lender, in an amount sufficient to enable Sollitt to realize any part of its retainage was very unlikely.

This court has held that the taxpayer need not "postpone his entitlement to a deduction in the expectancy of uncertain future events nor is he called to wait until some turn of the wheel of fortune may bring the debtor into affluence * * *." *Minneapolis, St. Paul & Sault Ste. Marie R.R. Co. v. United States,* 164 Ct.Cl. 226, 241 (1964). It would have taken a crystal ball for Sollitt to have seen the improvement in the real estate market and the eventual upswing in the inflation rate which preceded the sale of the project several years later. With no cause of action against either HUD or First Home and with Wou and SPA having obvious financial problems which appeared only to be getting worse, Sollitt would indeed have been an "incorrigible optimist" to have looked for satisfaction of the debt from those sources. *See United States v. White Mfg. Co.,* 274 U.S. 398, 403, 47 S.Ct. 598, 600, 71 L.Ed. 1120 (1927).

Having concluded that the worthlessness of the debt was grounded in the unlikelihood of a mortgage increase ever materializing, it becomes unnecessary to examine the question of partial worthlessness and the value an increase might have given the debt.

## CONCLUSION

Based on the above facts, I find that the retainage owed by SPA to Sollitt in the amount of $217,890 did in fact become worthless as of March 31, 1975, and was therefore properly taken as a bad debt deduction by Sollitt on its 1975 federal income tax return.