[No. 7433–4–I.   Division One.   June 23, 1980.]

RAINIER NATIONAL BANK, *Respondent,* v. TROY F. McCRACKEN, ET AL, *Defendants,* JOSEPHINE M. WETHERILL, ET AL, *Appellants.*

*James J. Keesling,* for appellants.

*Weinrich, Gilmore & Adolph, Robert J. Adolph,* and *Lance Dahl,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

Appeals are taken in these consolidated cases from a judgment and three orders of the Superior Court in a fraudulent conveyance case.

The judgment appealed from was based on findings that the conveyance of a seller's interest in a real estate contract was a fraudulent conveyance.

Two of the three orders appealed from were pretrial orders. One ordered the transferees of the contract conveyed to them by the fraudulent conveyance to pay the proceeds they received from the contract into the registry of the court. The other was a contempt order which imposed a $100 per day fine on the transferees based on their refusal to comply with the first order.

The third order appealed from was entered after the case had been tried and a creditor of the original transferor had obtained a money judgment against the transferees of the

contract who had collected the full balance owing on the contract. This order jailed the transferees for contempt because they refused to account for the disposition of the contract proceeds when required to do so by an order on supplemental proceedings.

It is necessary to an understanding of the issues presented to review the factual background of the case in some detail. Those facts, as they appear in the trial court's findings of fact and from uncontroverted documents admitted into evidence, are as follows.

Troy F. McCracken[1] owned and operated a business known as Sea–Van Mechanical, Inc. That firm did its banking business with Rainier National Bank and had since 1972. In order to get the credit needed by his firm, McCracken executed a personal guaranty to the bank to cover the indebtedness which his firm owed.

By 1976, McCracken was insolvent and was also heavily in debt to the bank. That situation pertained at all times herein referred to. McCracken's only asset of substantial value was a house. On June 24, 1976, he sold the house to a third party by a real estate contract. The contract provided that the purchaser would pay McCracken a balance of approximately $45,000 in installments of $404.88 per month.

On that same date, McCracken entered into an agreement with his mother, Josephine Wetherill and with her husband, Ernest H. Wetherill. This agreement was denominated "Loan and Option Agreement." Under its terms, the Wetherills were to loan McCracken $16,800 and, as security for their loan, obtain back an executed "Seller's Assignment of Contract and Deed" from McCracken. In the event the $16,800 loan was not fully repaid to the Wetherills by McCracken within 6 months, the agreement gave the

---

[1]Although both Troy F. McCracken and Nancy N. McCracken, his wife, and their marital community are defendants, for convenience, we will refer to Mr. McCracken as though he were the sole defendant. He is the one who was primarily involved in the transactions in question.

Wetherills the option to purchase McCracken's entire interest in the contract for an additional $16,000.

Although at the later trial the judge expressed considerable skepticism as to whether the initial $16,800 was ever actually paid by the Wetherills to McCracken (allegedly in small bills), the trial court in that trial went on to hold, however, that it had not been proven they didn't pay the money and proceeded to enter a finding that they had. The final $16,000 was clearly paid by the Wetherills on January 24, 1977 and under the terms of the "Loan and Option Agreement," they became owners of the entire seller's interest in the real estate contract as of that date. Thus, the Wetherills purchased McCracken's entire seller's interest in the contract on which approximately $45,000 was owing for the sum of $32,800.

Later that year, on September 8, 1977, the bank obtained a judgment in the sum of $86,669.87 against McCracken. It was during the bank's efforts to collect on that judgment that the details of McCracken's disposition of his house were discovered. It was also then that this course of litigation was commenced by the bank against the Wetherills.

The bank's position was and is that McCracken's sale of his interest in the contract to the Wetherills was a fraudulent conveyance which defrauded McCracken's creditor, namely the bank. The bank's further position was and is that since the Wetherills received the proceeds obtained from a refinancing of the real estate contract by the contract purchaser, the bank was at least entitled to a judgment against the Wetherills for whatever the contract was worth over and above whatever they paid McCracken for it.

It was during the pendency of the bank's suit against the Wetherills that the bank obtained a court order requiring the proceeds the Wetherills received from the contract, some $43,879.30, to be deposited into the registry of the court "pending the final resolution of this matter or pending further order of this court." That order is here appealed from by the Wetherills as is the contempt judgment finding the Wetherills in contempt of court because of their failure

to pay the contract proceeds into court and assessing a fine of $100 per day against them until they comply with the court's order. The order requiring the contract proceeds to be paid into the registry of the court was never obeyed and the $100 per day fine was never paid.

The Wetherills filed a counterclaim against the bank based on claimed abuse of process. They asked $500,000 general damages, $13,000 attorneys' fees and $100 per day to cover the continuing contempt fine they had been ordered to pay.

The case was tried to the court.

At the close of the trial, the trial court found and concluded from the evidence presented that the conveyance of the seller's interest in the contract from McCracken to the Wetherills was a fraudulent conveyance in violation of this state's fraudulent conveyance act, RCW 19.40, and that it was made in bad faith and for inadequate consideration. The trial court also found that the Wetherills in turn received proceeds from the payoff on the contract in the sum of $12,075.24 over and above what they had given McCracken for it. The trial court also held for the bank on the alternative equitable ground that the Wetherills had been unjustly enriched at the bank's expense in that same amount. On both grounds, the bank was given judgment against the Wetherills for $12,075.24.

The trial court based its determination that there was a fraudulent conveyance on the following facts which it found existed.

At the time of the transaction, McCracken was insolvent and deeply in debt to the bank. The $32,800 consideration McCracken presumably received from the Wetherills was inadequate in that $45,000 was owing to him on it, and that shortly before the Wetherill transaction, McCracken had refused a cash offer for the sale of the house exceeding what he received from the Wetherills. The transaction was between close relatives, namely mother and son. The threat of litigation was inherently present because of the large debt McCracken owed the bank and the extreme financial

trouble he was in at the time. The house represented McCracken's only substantial asset.

The trial court also relied on the existence of certain elements of concealment and departure from the usual means of handling such a transaction in ruling as it did. These included that the installment payments received on the contract by the Wetherills from the purchaser of the house were placed in a secret manner in a savings account which had a false name on it. On January 24, 1977, the same day that the Wetherills made their $16,000 payment which gave them the right to McCracken's interest in the contract, they opened a savings account into which they put the monthly payments received on the contract. That account named Mr. and Mrs. Wetherill as co-owners along with one "N. Nelson." At her deposition, Mrs. Wetherill testified under oath that "N. Nelson" was Nellie Nelson, her 75-year-old sister, when, in fact, "N. Nelson" was Nancy Nelson McCracken, the then wife of Mrs. Wetherill's son. Furthermore, Mrs. Wetherill did not file the "Seller's Assignment of Contract and Deed" dated July 1, 1976 for public record until June 16, 1978, when it was filed in response to the bank's collection efforts just before the bank commenced garnishment proceedings. That was a filing delay of almost a year and a half after the Wetherills became the owners of the contract.

At trial, in addition to granting the bank judgment for $12,075.24 against the Wetherills, the trial court dismissed the Wetherills' counterclaim against the bank with prejudice because of the Wetherills' failure to present any evidence in support of it.

Subsequent to obtaining its judgment against the Wetherills, the bank commenced supplemental proceedings against them in an effort to collect its judgment. As the culmination of lengthy and unsuccessful efforts to recover on the judgment, the Superior Court ordered the Wetherills jailed from 7:30 a.m. to 5:30 p.m. daily until such time as they obeyed the court's order to make a full and complete accounting of the proceeds they had received from the sale

of the real estate contract (or until they paid the judgment against them).[2]

This appeal presents four issues.

## ISSUES

ISSUE ONE. Did the trial court err in determining that the transaction in question was a fraudulent conveyance?

ISSUE TWO. Did the trial court err in dismissing the abuse of process counterclaim with prejudice?

ISSUE THREE. Did the trial court err in entering a pretrial order requiring that the contested funds be paid into the registry of the court pending the outcome of this litigation and in then finding the possessors of such funds in contempt of court when they refused to obey such order?

ISSUE FOUR. Did the trial court err in ordering the transferees of the fraudulent conveyance to be incarcerated until they complied with the court's postjudgment order requiring them to provide a detailed accounting of the proceeds received from the sale of the property so received?

## DECISION

ISSUE ONE.

CONCLUSION. In view of the circumstances found to have attended the conveyance in question, the trial court did not err in determining that it was a fraudulent conveyance.

■■ The law recognizes that an individual has, primarily, a right to dispose of his or her property as that individual deems fit. The owner may not, however, so dispose of such land or goods as to infringe upon the right of another person, and a disposition of property is not sustainable if it necessarily accomplishes a fraudulent result. The principle underlying the law of fraudulent conveyances is that the creditor has a claim on the property of his or her debtor, constituting a fund from which the debt should be paid, and that the debtor may not ignore the right or

---

[2]Two parenthetical observations should perhaps be made at this point. One is that the orders in this case, including those appealed from, were entered by several different Superior Court judges. Another is that the Wetherills did ultimately obtain their release pending appeal by posting a bond.

equity of his or her creditors to be paid out of it. Consequently, if a debtor exceeds legitimate authority over the debtor's property by disposing of it with intent to delay or defraud that debtor's creditors, such disposition is deemed inequitable in the law and subject to being set aside. Such a transaction is, by definition, a fraudulent transfer or conveyance. 37 Am. Jur. 2d *Fraudulent Conveyances* § 1 (1968).

A fraudulent conveyance, or more correctly a conveyance in fraud of creditors, may generally be defined as a transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his or her creditors, or which operated to the prejudice of their legal or equitable rights—or a conveyance which operated to the prejudice of the legal or equitable rights of other persons, including subsequent purchasers. 37 Am. Jur. 2d *Fraudulent Conveyances* § 1 (1968).

This state in common with many others has adopted the uniform fraudulent conveyance act, RCW 19.40. That act is in general a declaration of the common law. *Osawa v. Onisha*, 33 Wn.2d 546, 554, 206 P.2d 498 (1949).

There are certain circumstances which so frequently attend conveyances or transfers to defraud creditors that they are recognized as badges or indicia of fraud. "Among the generally recognized badges of fraud are the insolvency or indebtedness of the transferor, lack of consideration for the conveyance, relationship between the transferor and the transferee, the pendency or threat of litigation, secrecy or concealment, departure from the usual method of business, the transfer of the debtor's entire estate, the reservation of benefit to the transferor, and the retention by the debtor of possession of the property." (Footnotes omitted.) 37 Am. Jur. 2d *Fraudulent Conveyances* § 10, at 701–02 (1968). *Accord*, 37 C.J.S. *Fraudulent Conveyances* §§ 79–97 (1943).

Under the facts found by the trial court in this case, virtually all, if not all, of these badges of fraud or bad faith were found to exist. Since there was substantial evidence

supporting such findings, the trial court did not err in concluding that the transfer of the seller's interest in the real estate contract by McCracken to the Wetherills was a fraudulent conveyance. We therefore deem it unnecessary to address the alternative unjust enrichment theory.

ISSUE TWO.

CONCLUSION. The trial court did not abuse its discretion in refusing to permit the taking of a voluntary nonsuit on the counterclaim and in then dismissing the counterclaim with prejudice when no evidence was presented in support thereof.

Shortly before trial, the Wetherills moved to file an abuse of process counterclaim against the bank. Their motion was granted and the counterclaim was filed. The bank thereupon filed an answer thereto. Then at the time the case was called for trial, the Wetherills moved the trial court for a voluntary nonsuit of their counterclaim without prejudice. The trial court denied that motion and at the end of the trial, when no evidence was introduced in support of the counterclaim, the trial court dismissed the counterclaim with prejudice. The Wetherills assign error to these rulings.

It is, of course, true that voluntary nonsuits without prejudice are broadly permitted by CR 41. However, that rule also provides:

**Dismissal of Counterclaim, Cross-Claim, or Third-Party Claim.** The provisions of this rule apply to the dismissal of any counterclaim, cross-claim, or third-party claim. A voluntary dismissal by the claimant alone pursuant to paragraph (1) of subdivision (a) of this rule shall be made before a responsive pleading is served or, if there is none, before the introduction of evidence at the trial or hearing.

CR 41(c). The holdings under the identical federal rule are summarized in 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2374, at 243–44 (1971):

After service of a responsive pleading or, if there is no such pleading, after the introduction of evidence at the trial or hearing, the allowance of the dismissal of a counterclaim is not a matter of right, but is subject to the

discretion of the court. The involuntary dismissal of a counterclaim, cross-claim, or third-party claim, except for lack of jurisdiction, improper venue, or failure to join a party under Rule 19, is an adjudication of the merits unless the court otherwise specifies.

(Footnotes omitted.) This correctly states the law. *White v. E.L. Bruce Co.*, 62 F. Supp. 577, 578 (D. Del. 1945).

Where, as here, the plaintiff had filed a responsive pleading to the counterclaim, the trial court had the discretion to deny the taking of a voluntary nonsuit without prejudice on the counterclaim. Since the trial was ready to begin when the voluntary nonsuit motion was made, and since this would have necessitated plaintiff's witnesses being called again if a separate trial were held on the counterclaim (as the trial court pointed out in ruling on the motion), the trial court did not abuse its discretion when it denied the motion for voluntary nonsuit without prejudice as to the counterclaim.

Furthermore, when the defendant did not press its counterclaim in any way or present evidence in support of it, the trial court also had the right to consider it abandoned and dismiss it with prejudice. *Edward B. Marks Music Corp. v. Borst Music Publishing Co.*, 110 F. Supp. 913, 914-15 (D.N.J. 1953); *Walt Disney Prods. v. Fred A. Niles Communication Center, Inc.*, 253 F. Supp. 1, 11-12 (N.D. Ill. 1966).

ISSUE THREE.

CONCLUSION. A party who claims title or right to funds in his or her possession cannot be compelled to pay such funds into the registry of the court in a summary manner, or be held in contempt for the failure to do so.

Washington has a deposits in court statute which reads:

Deposits in court—Order. When it is admitted by the pleading or examination of a party, that he has in his possession, or under his control, any money, or other thing capable of delivery, which being the subject of the litigation, is held by him as trustee for another party, or which belongs or is due to another party, the court may order the same to be deposited in court, or delivered to

such party, with or without security, subject to the further direction of the court.

RCW 4.44.480. Other statutes make specific provision for the enforcement of such orders, RCW 4.44.490, and for custody of money so deposited, RCW 4.44.500.

■ As one early case expresses it, "'if money is ordered to be brought in, which is not clearly due, very gross injustice may be done, as the defendant may be put to great inconvenience, and afterwards be told that his view of the case was correct.'" *Green v. Duvergey*, 146 Cal. 379, 385, 80 P. 234, 237 (1905), citing *Hagell v. Currie*, L.R. 2 Ch. App. 449 (1867).

The law in this connection is well summarized in a California case construing a California statute substantially the same as our own statute (RCW 4.44.480 set out above):

"The right of the court to make an order for deposit or delivery depends on the facts as shown to the court. A party to a controversy involving a right to a certain sum of money or thing cannot be required to deposit that money or thing in court unless it is either clearly admitted in his pleading or shown in some proceeding in the cause that he has himself no right to retain it and that the other party to the action is entitled to it or at least has an absolute interest in it. In all cases it must appear that the party holds the money as trustee, or that it belongs or is due to another party. If the party alleged to hold as trustee claims title or right to all or part of the funds in his possession, the court is without jurisdiction to compel him to surrender them by ordering a deposit in court, since this constitutes an issue which should not be tried in this summary manner, but one which requires a judicial determination, on the hearing of all the facts, that he has no right to the funds. If it appears from the proceedings that the right of the other party is dependent on his performance of some condition, or if the party applying for the order does not claim an immediate right to the money, or disputes the existence of the condition, the court will not order the money to be deposited before a hearing and judicial determination, in order to avoid the gross injustice of putting a party to great

inconvenience before finding his view of the case to be correct.

"The statute does not authorize an order unless it is shown that a party to the action actually has a fund or property in his possession or under his control. Furthermore, an order is not authorized if the fund or property is not the subject of the litigation, but its payment is merely an incident thereto dependent on the judgment to be rendered, as in the case of an action for redemption, specific performance, accounting, rescission, or the like."

*In re Elias,* 209 Cal. App. 2d 262, 274–75, 25 Cal. Rptr. 739, 747–48 (1962), quoting 23 Cal. Jur. 2d *Funds and Deposits in Court* § 5, at 568–69. *Accord,* 23 Am. Jur. 2d *Deposits in Court* § 2, at 736 (1965); 26A C.J.S. *Deposits in Court* § 1(d)(1), at 472–73 (1956).

The bank, on the other hand, argues that the holding in *First Nat'l Bank v. Baker,* 141 Wash. 672, 252 P. 105 (1927) authorized the pretrial court order which required that the proceeds from the contract be paid into the registry of the court. The court in *Baker* said as follows:

We see no good reason, nor is any suggested, why the court hasn't the power to require a fund over which there is a controversy to be paid into court where one of the parties to that controversy is an administratrix as much so as it has in any other kind of a case.

*First Nat'l Bank v. Baker, supra* at 674. We do not consider that opinion controlling here because on the face of that ruling, and from the lack of any authority cited in the opinion to support it, it seems obvious that the deposits in court statute (the predecessor to RCW 4.44.480 set out above) was not cited to the court and was therefore overlooked.

Here, the bank obtained a pretrial order which required that the more than $43,000 proceeds obtained by the Wetherills from the real estate contract be deposited into the registry of the Superior Court. Since the Wetherills at all times claimed title and right to all of those funds, and since that issue had not been judicially determined at the time, the order was invalid. It follows that the $100 per day

contempt fine against them was also invalid. *See State ex rel. Kerl v. Hofer,* 4 Wn. App. 559, 482 P.2d 806 (1971); *Allen v. American Land Research,* 25 Wn. App. 914, 922–23, 611 P.2d 420 (1980).

ISSUE FOUR.

CONCLUSION. Disobedience of any valid court order constitutes contempt unless the person disobeying the order is unable to comply with it. Under the facts of this case, the trial court did not err in ordering the transferees of the fraudulent conveyance jailed for contempt until they complied with the court's order requiring them to provide a detailed accounting of their disposition of the proceeds therefrom.

■ Supplemental proceedings subsequent to judgment are authorized by statute, RCW 6.32. The purpose of such proceedings is to make the judgment debtor answer concerning the extent and whereabouts of his or her property and, if possible, to enable the judgment creditor to locate nonexempt property belonging to the judgment debtor which may be applied on the debt. *See* 1 V. Towne, Wash. Prac. § 781, at 353 (2d ed. 1976).

Here the bank followed statutory procedures in endeavoring to locate nonexempt property belonging to the Wetherills to apply on the judgment the bank had against them. The unsuccessful efforts to get the Wetherills to comply with the various orders on supplemental proceedings forms a necessary backdrop to an understanding of the trial court's order committing them to jail for contempt. The following is a chronology of the principal events in that regard.

February 21, 1979. After a several day long trial, the trial court concluded that the assignment of the real estate contract constituted a fraudulent conveyance and that the Wetherills had been unjustly enriched thereby. The bank was awarded judgment against the Wetherills for their damages in the sum of $12,075.24.

March 27, 1979. The Wetherills were personally served with a subpoena duces tecum and an order to appear for supplemental proceedings.

April 6, 1979. On or about this date, the Wetherills failed to appear in court to be questioned as to assets pursuant to supplemental proceedings ordered.

April 18, 1979. The Wetherills were again served with another order to appear for supplemental proceedings.

April 26, 1979. The Wetherills again failed to appear in court to be questioned as to assets at the time specified in the order. The judge ruled them in contempt for violation of the orders to appear and issued a bench warrant for their arrest for contempt of court. The record suggests that the Wetherills may thereafter have absented themselves from the jurisdiction.

August 3, 1979. Ultimately, after more than 3 months had passed since the warrant issued, the Wetherills surrendered themselves to the court for questioning as to assets at supplemental proceedings. At that time Mrs. Wetherill stated under oath that the balance of the contract proceeds were in cash and stored in a small suitcase in the Wetherill apartment. She also testified that except for a few thousand dollars, the money had been spent. The presiding judge ordered the supplemental proceedings continued and that a writ of execution on the property issue.

August 13, 1979. A deputy sheriff went to the Wetherills' apartment pursuant to a writ of execution to obtain the cash testified to by Mrs. Wetherill. The deputy was informed by Mrs. Wetherill that her husband had flown to Montana on August 7, 1979 and had taken the balance of the cash proceeds of the contract with him.

October 29, 1979. Then another order was entered. It provided:

> ORDERED that the Wetherills on or before November 7, 1979, prepare and deliver to this Court and [the bank] a *full and complete accounting* of the proceeds from the

Real Estate Contract which were disbursed to the Wetherills on July 29, 1979 [*sic*].

(Italics ours.)

November 8, 1979. The Wetherills' attorney then filed a pleading subscribed to by the Wetherills entitled "Accounting." It reads:

Defendants Wetherill advise the court that in respect to the $12,074.75 acquired fifteen months ago (July 1978), they have used the same at the rate of approximately $800.00 per month for living and travel expenses.

They have made several trips to Montana, Nevada and a trip to San Francisco, California during said period, and the travel and other expense of said trips are included in said amount.

The undersigned do not have any funds with which to pay said judgment.

November 26, 1979. A motion for contempt was brought on and heard. Counsel for the Wetherills was present. The court found that no accounting was prepared as ordered and held the Wetherills in contempt of court. The court directed that they purge the contempt by submitting an accounting by 9 a.m. on December 4, 1979 or appear for sentencing.

December 4, 1979. The Wetherills appeared in court. The court found that they had not submitted a full and complete accounting of the more than $43,000 in proceeds received from the real estate contract, and that they remained in contempt. An order of contempt was entered. It ordered the Wetherills confined to the King County jail between the hours of 7:30 a.m. and 5:30 p.m. daily until such time as they purge themselves of contempt by fully accounting to the court for the disposition of the proceeds of the sale of the real estate contract (or in the alternative, until the judgment in the amount of $12,075.24 is satisfied).

December 20, 1979. The trial court reconsidered its December 4, 1979 order committing the Wetherills to jail but adhered to its December 4 ruling. In so deciding, the trial court noted among other reasons that the Wetherills "claim to have gone to Nevada with the said money and

have refused in open court to in any way itemize an accounting for any sum of money."[3]

In *Keller v. Keller,* 52 Wn.2d 84, 88, 323 P.2d 231 (1958), the State Supreme Court comprehensively reviewed the contempt law of this state which until then had contained, in the words of the court, "a certain amount of confusion . . ." As that opinion made clear, what we are presented with in the present case is civil rather than criminal contempt and its purpose is coercive not punitive. That

---

[3]The Clerk's papers filed with this court contain another document entitled "Accounting" subscribed to by the Wetherills and filed by their attorney. It bears a December 24, 1979 Superior Court date stamp on it indicating that it was filed 4 days after the December 20, 1979 hearing. Whether or not it was also considered by the trial court is unclear from the record before us, but based on other proceedings referred to herein, we presume that it was. In any event, it does not appear any more a "full and complete accounting" than the so-called November 8, 1979 "Accounting." It reads:

The undersigned received funds of approximately $43,315 on or about July 27, 1978 which were disbursed during the period ending Dec. 4, 1979 (one year—four months (16 months)) approximately as follows:

| | | |
|---|---|---:|
| Living expense | (includes food, rent, taxes, clothes, insur., utilities, medical, misc.) at $800 per mo. ea. | $25,600.00 |
| Transportation Reno | (air fares) Montana 4 trips Reno 2 trips | 1,600.00 |
| Mapes Hotel (starting 5/23/79) | | |
| Misc. exp. (for 2) | | 450.00 |
| Gambling—loss | | 4,960.00 |
| Sands Hotel (starting 8/14 or 16/79) | | |
| Misc. exp. (for 2) | | 480.00 |
| Gambling—loss | | 5,910.00 |
| Montana (4 trips) | | |
| Misc. living, transportation (non–air) exp. gifts to grandchildren, etc. | | 2,780.00 |
| Attorneys fees | | 7,480.00 |
| | | $49,260.00 |

Under its "full and complete accounting" order, the trial court, *for example,* could reasonably insist on the following detail for each of the many airplane tickets the contemners claim they purchased:

1. Who purchased it and from whom was it purchased?

2. What price was paid for it?

3. Was it paid by check, credit card, money order or whatever other means may have been used?

4. Where was the place of origin and the place of destination of the trip?

5. When was it purchased and when was it used?

6. Why was it purchased?

is, the contempt order is not designed to punish, but to secure compliance with the trial court's order. Thus the civil show cause procedures employed in the trial court were appropriate.

It is, therefore, unnecessary to discuss the inherent powers of the superior court as a constitutional court since the civil contempt statute, RCW 7.20.010 *et seq.*, specifically covers the situation here presented.

Disobedience of a lawful court order is specified by state statute as contempt. RCW 7.20.010(5).[4] *See also* RCW 6.32.180 which provides that disobedience of orders in supplemental proceedings is contempt. Another statute is equally specific as to the power of the court to enforce its order in the manner that it did here:

> Imprisonment until act performed. When the contempt consists in the omission or refusal to perform an act which is yet in the power of the defendant to perform, he may be imprisoned until he shall have performed it, and in such case the act must be specified in the warrant of commitment.

RCW 7.20.110.

*State ex rel. Ewing v. Morris,* 120 Wash. 146, 207 P. 18 (1922) is similar. In that case, the Supreme Court upheld an order jailing a receiver until such time as he filed the report the Superior Court had ordered him to file, but which he had refused to file. Basing its decision on what is now RCW 7.20.010(5), the court held that "[t]he failure or refusal to comply with the order of the court or purge the contempt, is a continuing contempt, and the court may base judgment thereon." *State ex rel. Ewing v. Morris, supra* at 154.

■ Finally, the jailing for contempt does not violate Const. art. 1, § 17, which provides: "There shall be no

---

[4] "Contempt of court defined. The following acts or omissions, in respect to a court of justice or proceedings therein, are deemed to be contempts of court:
". . .
"(5) Disobedience of any lawful judgment, decree, order or process of the court." RCW 7.20.010(5).

imprisonment for debt, except in cases of absconding debtors." The December 4, 1979 contempt order by its terms jailed the Wetherills because of their disregard of the court's order for a full and complete accounting. No one was imprisoned for the failure to pay a money judgment; therefore, the constitutional prohibition was not violated. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 327, 338, 553 P.2d 442 (1976). The provision in the order providing for release on payment of the judgment did no more than state what the effect of the law is in any event once the underlying controversy is terminated in a civil case involving a coercive contempt order. *See State ex rel. Kerl v. Hofer,* 4 Wn. App. 559, 482 P.2d 806 (1971); *Allen v. American Land Research,* 25 Wn. App. 914, 611 P.2d 420 (1980).

Here the trial court was confronted with a rather extraordinary degree of recalcitrance on the part of the contemners. Based on the facts which we have above reviewed in some detail, it is apparent that the trial court had patiently exhausted all alternatives except two. The trial court could either exalt the contemners by refusing to do anything about their persistent refusal to comply with lawful court orders in supplemental proceedings (particularly the order to provide a full and complete accounting, something well within their power to do). To do that, however, would, in effect, declare them above the law. Or, the trial court could do as it ultimately did, enforce the clear mandate of law in the only way left open to it and jail the contemners for contempt until they complied with the order.

One of the foundations on which this nation is built is that no person is above the law, and the trial court reluctantly but firmly ordered the Wetherills jailed for contempt only when it had no other reasonable alternative. The trial court ameliorated its order by providing that the contemners would be released from jail each evening so they could spend each night in their home. The order of the trial court also made it completely clear that the

contemners at all times carry with them the keys to the jail door in that all they need to do in order to purge themselves of contempt and obtain their full release is to "fully account" to the court as to the disposition of the over $43,000 in proceeds that they received as a result of the fraudulent conveyance.

We have considered the remaining contentions of the appellants and find them without merit.

The prejudgment order of July 19, 1978 and the contempt order of September 22, 1978 (including the $100 per day fine required thereby) are reversed. The judgment of $12,075.24 and the postjudgment contempt order of December 4, 1979 (including the confinement required thereby) are affirmed.

JAMES, A.C.J., and DURHAM–DIVELBISS, J., concur.

Reconsideration denied October 7, 1980.

Review denied by Supreme Court January 30, 1981.