**EXXON CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 235–79T.

United States Claims Court.

Jan. 29, 1985.

Robert L. Moore, II, Washington, D.C., with whom were John B. Magee, Thomas D. Johnston, J. Brad Anwyll, and Miller & Chevalier, Chartered, for plaintiff.

George L. Squires, Washington, D.C., with whom were Acting Asst. Atty. Gen.

Roger M. Olsen and Mildred L. Seidman, for defendant.

## OPINION

KOZINSKI, Chief Judge.

Exxon Corporation sues for a refund of taxes and interest for a disallowed deduction on the 1960 consolidated income tax return of Standard Oil Company (New Jersey)[1] and its subsidiary, Esso Export Corporation. Exxon claims that it was entitled to deduct $27,357,644 because of a debt in that amount owed by Esso Standard Oil S.A., or its Cuban division, to Esso Export Corporation. On August 6, 1960, the Cuban assets of Esso Standard Oil S.A. were nationalized by Fidel Castro and the debt was never repaid.

### Facts

On New Year's Day 1959, Fidel Castro seized power in Cuba, ousting the government of Fulgencio Batista. At that time, Esso Standard Oil S.A. (Essosa), a Panamanian corporation, was headquartered in Havana. Essosa was a wholly-owned subsidiary of Standard Oil Company (New Jersey) (Standard), and was in the business of refining and marketing petroleum products in 18 Caribbean countries. Operations in each country were conducted by a local division, each division having its own management, staff, assets, payroll and financial statements. The Havana headquarters coordinated the operations of Essosa's divisions and provided certain managerial services. (For ease of reference, Figure 1 presents a chart of the Standard subsidiaries and divisions relevant to the issues here presented.)

1. On November 1, 1972, Standard Oil Company (New Jersey) was renamed Exxon Corporation.

Figure 1

Essosa's Cuban division was its largest and the only one with a refinery. At the time its assets were expropriated by the Cuban government, the Cuban division supplied approximately one-half of Cuba's daily petroleum needs. Subsidiaries of Royal Dutch Petroleum (Shell) and the Texas Oil Company (Texaco) supplied the balance.

Essosa's divisions obtained the petroleum products they marketed, as well as other supplies, through Esso Export Corporation (Esso Export), another wholly-owned Standard subsidiary. Esso Export acted as a middleman, accepting orders from Essosa's divisions and filling them with products and services provided by other Standard subsidiaries worldwide.

Among the products Esso Export provided to Essosa's Cuban division was the crude oil for its refinery, located in Belot, Cuba. The oil was normally purchased from Creole Petroleum Corporation (Creole), a domestic subsidiary of Standard that produced crude oil in Venezuela. Creole sent invoices for the oil directly to Essosa's Cuban division. Esso Export arranged for shipping the oil to Cuba. After the crude oil was shipped, Creole assigned its invoice to Esso Export, which paid it immediately, less a one percent carrying charge. Esso Export then collected the full invoice amount from the Cuban division. The Cuban division was required to pay the invoices in U.S. dollars and normally did so within 30 days.

Shortly after Castro came to power, the Cuban government began to impose currency exchange restrictions. As of August 1959, the Cuban Monetary Stabilization Fund, a division of the Cuban National Bank, required importers to obtain approval before paying their foreign suppliers in dollars. Because such approval was slow

in coming, Essosa's Cuban division was unable to pay its debts to Esso Export in a timely fashion. By June of 1960, its outstanding debt had ballooned to approximately $27.4 million.

In late 1959, Standard determined that, in light of the uncertainty surrounding the Cuban situation, it would be prudent to reorganize Essosa, relocating its headquarters and transferring its non-Cuban assets to a company located beyond Castro's reach. Accordingly, Essosa's headquarters operations were moved to Coral Gables, Florida in January of 1960. At the same time, a plan was formulated whereby Essosa's non-Cuban assets would be transferred to a new company that had no nexus to Cuba.

On February 3, 1960, Standard submitted a reorganization plan to the Internal Revenue Service and requested a ruling confirming that the proposed transaction would qualify as a tax-free reorganization as to which no gain or loss would be recognized under section 355, and which did not violate section 367 of the Internal Revenue Code. The plan provided that Essosa would transfer all of its assets not physically located in Cuba to Esso Standard Oil S.A., Ltd. (Essosa Ltd.), a corporation to be formed in Bermuda.[2] In exchange, Essosa Ltd. would transfer all of its capital stock to Essosa, which would immediately distribute this stock to Standard. On April 18, 1960, the IRS issued a ruling providing that the transaction was not one in "pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes within the meaning of section 367 of the Internal Revenue Code of 1954;" that it would "constitute a [tax-exempt] reorganization under section 368(a)(1)(D) of the Internal Revenue Code of 1954;" and that, in accordance with "section 355 of the Code, no gain or loss will be recognized to, and no amount will be includible in the

income of, [Standard] upon the receipt by it of all the stock of the new company as a distribution with respect to its stock." On June 30, 1960, Standard carried out the planned reorganization.

Meanwhile, relations between Cuba and the United States were rapidly deteriorating. In February 1960, Castro signed a trade agreement with the Soviet Union enabling Cuba to import Soviet goods, including crude oil, on a barter basis. On May 17, 1960, the Cuban government requested that Essosa's Cuban division, as well as Shell and Texaco, process crude oil that had been shipped from the Soviet Union. In early June, the Secretary of the Treasury, at the request of President Eisenhower, asked that Standard and Texaco refuse to refine the Soviet crude oil.[3] Accordingly, on June 6, 1960, the oil companies informed the Cuban government that they would not take delivery of the Soviet crude or refine it in their facilities. On June 29, 1960, a token amount of Soviet oil was delivered to the Texaco refinery. When Texaco refused the delivery, the Cuban government "intervened" Texaco's Cuban subsidiary. Intervention gave the Cuban government control over the refinery but did not divest Texaco of title or ownership.

On July 1, 1960, one day after Standard had carried out its reorganization, the Cuban authorities delivered a quantity of Soviet crude oil to Essosa and Shell. Both companies refused to refine the Soviet oil. The Cuban government promptly intervened both companies, i.e., it placed their operations under government control. On August 6, 1960, Cuba formally confiscated all assets of Essosa's Cuban division, including the Belot refinery. As a result of the June reorganization, the confiscated assets were the last of Essosa's property.

At the time of the confiscation, Essosa owed Esso Export more than $27 million.[4]

---

2. The place of incorporation of Essosa Ltd. was later changed to the Bahama Islands. The IRS gave its approval to this change in a letter issued on June 16, 1960.

3. At the urging of President Eisenhower, the British Prime Minister made the same request of Shell.

4. The parties disagree whether the debt was owed to Esso Export by Essosa or by Essosa's

Since the confiscation of the refinery left Essosa without any assets, it was unable to repay the debt. As a consequence, on its 1960 consolidated income tax return, Standard claimed a bad debt deduction in the amount owed Esso Export by Essosa. This deduction was disallowed on audit. Plaintiff brought this suit in part[5] to recover the amounts it paid as a result of this disallowance.

### Issues Presented

■■■ A taxpayer is entitled to a bad debt deduction under Section 166 of the Internal Revenue Code unless there is a reasonable prospect that it can recover the amounts owed. *Sollitt Construction Co. v. United States*, 1 Cl.Ct. 333, 345 (1983); *see Parmelee Transportation Co. v. United States*, 173 Ct.Cl. 139, 154, 351 F.2d 619 (1965); *see also Dustin v. Commissioner*, 467 F.2d 47, 48 (9th Cir.1972); *Allen-Bradley Co. v. Commissioner*, 112 F.2d 333, 335 (7th Cir.1940). Whether the taxpayer has a reasonable prospect of recovering the debt is a question "confined to the fact of the particular case." *Minneapolis, St. Paul & Sault Ste. Marie R.R. v. United States*, 164 Ct.Cl. 226, 240 (1964); *Levin v. United States*, 220 Ct.Cl. 197, 208, 597 F.2d 760 (1979). The "burden is on the taxpayer to show that it did not have a reasonable prospect of recovery at year end, and that the debt therefore became worthless in a particular year." *Sollitt*, 1 Cl.Ct. at 345.

Defendant does not claim that Esso Export could have collected its $27.4 million from Essosa, the debtor. After the confiscation of its property by the Castro regime, Essosa was left without assets and therefore without any means to satisfy the debt. Defendant argues, however, that plaintiff had a reasonable prospect of recovering against Standard on a theory of fraudulent conveyance. In the government's view, the June 30 reorganization was a fraudulent conveyance because it left Essosa insolvent. The transaction could therefore have

been set aside by a creditor of Essosa seeking to collect on its debt. While the familial relationship between the transferor, the transferee and the creditor rendered such a lawsuit impractical here, defendant suggests that an arms' length creditor would not have given up on $27.4 million so cavalierly. Defendant argues that a lawsuit between Esso Export and Standard to collect the $27.4 million on a theory of fraudulent conveyance would have had a reasonable prospect of success and that, therefore, Standard's claim for a bad debt deduction cannot be sustained.

Plaintiff raises a series of arguments in opposition. It first argues that the Service is precluded from claiming that Essosa was rendered insolvent as a result of the reorganization by virtue of the letter ruling it issued approving the reorganization as tax free. Second, plaintiff suggests that Essosa was not rendered insolvent by the reorganization because the Cuban assets were worth more than Essosa's debts. Third, plaintiff argues that the transfer of Essosa's non-Cuban assets during the reorganization had no effect upon the debtor's solvency because these assets were held by Essosa's non-Cuban divisions and, under Cuban law, could not have been reached by Esso Export in collecting on a debt owed by Essosa's Cuban division. Finally, plaintiff argues that the right to proceed against a third party under a theory of fraudulent conveyance is not an action on the debt and therefore may not be considered in determining whether the debt is worthless.

### Discussion

#### A. *The Commissioner's Ruling*

Plaintiff first argues that the Commissioner is precluded from arguing that Essosa was insolvent by virtue of the letter ruling that approved the reorganization of Essosa under section 368(a)(1)(D). Plaintiff correctly notes that a condition of a valid

---

Cuban division as a separate and distinct legal entity. This issue is discussed at greater length below. *See* pp. 354–355 *infra*. For convenience, the court will refer to the debt as Essosa's.

5. Plaintiff's other claims are not before the court at this time.

reorganization under section 368(a)(1)(D) is that there continue to be an equity interest in both surviving entities. An equity interest, reasons plaintiff, requires that both entities be solvent. Plaintiff concludes that the Commissioner is bound by the ruling's underlying factual premise, namely, that Essosa was solvent after the reorganization.

■ In obtaining the ruling that the proposed reorganization would be tax free pursuant to sections 355, 367 and 368 of the Code, the taxpayer presented information as to its financial condition, consisting principally of its balance sheets. The Service chose not to probe further into the accuracy of the information presented, although it could well have done so. Under these circumstances, the Service might now be precluded from challenging the factual underpinnings of that financial information if it wished to tax the reorganization transaction. However, the taxability of the reorganization is not in issue because the Service is not attempting to renege on its ruling. At issue here is a question that was never presented to or considered by the Service when it issued its ruling. As the Court of Claims noted in an analogous context, in issuing its ruling "the Service was not trying to take all possible tax consequences into account, but only those involving provisions requested by the corporation and expressly mentioned in the ruling." *Jeffers v. United States*, 214 Ct.Cl. 9, 24, 556 F.2d 986 (1977).[6] Had the taxpayer wished to obtain a ruling on the bad debt deduction, it could have presented the issue to the IRS in its ruling request. The Service might then have examined the factual data more closely and reached an entirely different conclusion. It would render the revenue ruling process entirely unworkable if a taxpayer could bind the Service to legal positions it has never considered and that arise by secondary or ter-

tiary implication from the issues actually presented. The court therefore rejects plaintiff's argument that defendant is foreclosed from challenging Essosa's solvency and now turns to the merits of that claim.

**B.** *Essosa's Solvency*

Essosa's June 30, 1960, balance sheet showed Cuban Division assets of $76 million and liabilities of $48 million. At least on paper, then, Essosa was solvent. However, the balance sheets were based on the situation as it existed before Castro. The reorganization, which transferred all non-Cuban assets out of Essosa, took place some 18 months after the Castro regime had come to power and dramatically changed the Cuban business climate. This change affected the confidence of investors and, consequently, the market value of Essosa's Cuban assets. The key factual question presented at trial was whether, at the time of the reorganization, the value of Essosa's Cuban assets was so affected by the political situation that they were worth less than its outstanding liabilities. Or, putting the question somewhat differently, the court was asked to determine whether an arms' length, informed investor would have been willing to pay a price that was more than nominal for the Belot refinery and Essosa's other Cuban assets, given that they were burdened with $48 million in liabilities.

The evidence at trial presented a surprisingly consistent view of the events following Castro's rise to power. A number of witnesses who lived in Cuba at the time, and who dealt first-hand with officials of the new Cuban government, related their experiences and observations. Although the witnesses disagreed on some details, the disagreements were largely on questions of judgment; there was little or no disagreement as to the underlying facts. The witnesses painted a clear and consist-

---

**6.** In *Jeffers,* the ruling contained language expressly limiting its reach to those sections actually considered. While such language is useful in avoiding taxpayer confusion, it is not required and was not the linchpin of the court's decision. In *Jeffers,* as in this case, the key fact was that those portions of the ruling that granted exemption from taxation were "referenced to an appropriate provision of the Code's reorganization sections," and the ruling did not purport to address other issues. 214 Ct.Cl. at 24.

ent picture of a country caught up in violent political, social and economic change; of a mercurial government dominated by Castro and subservient to his whim; and of a blossoming relationship with the Soviet Union, with disquieting economic implications for investors from western countries. By June of 1960, those who would do business in Cuba had cause for serious concern.

Not all signs were discouraging, however. From time to time, the Castro regime made overtures to western investors, permitted the expatriation of some hard currency and took other apparently positive steps. Oil company officials had particular reason for optimism because Cuba does not produce its own crude oil and its economy is therefore entirely dependent upon oil imports from abroad. Officials at Standard felt that Castro would not dare to confiscate the company's assets for fear that Standard would retaliate by cutting off the supply of crude oil that it was importing onto the island. The possibility that the Soviet Union would supply the island's entire crude oil needs on a sustained basis, as it since has, was considered highly remote in 1960.

Standard Oil officials, nevertheless, were not so sanguine about the Cuban situation as to continue doing business as usual. In fact, the company took every reasonable precaution to place its assets beyond Castro's grasp. It is highly significant that Standard removed its Essosa headquarters office from Havana to Florida, and that it reorganized its subsidiaries so as to place all non-Cuban assets in a new corporation that had no nexus to Cuba. Plaintiff's witnesses (Standard Oil officials) candidly admitted that this was done to thwart any plan Castro might develop to expropriate or otherwise interfere with the company's assets that were located outside of Cuba. Standard's concern about the assets held within Cuba must have been significantly greater.

A potential arms' length purchaser would doubtless have had similar concerns and would have discounted the value of the Cuban assets accordingly. Moreover, the possibility of expropriation was not the only risk a potential buyer would have considered. Short of confiscating all of the company's assets, the Cuban government might well have placed a variety of conditions and restrictions on the operation of the refinery, the distribution and sale of refined products, and the expatriation of profits. Each of these restrictions could have seriously interfered with the profitability of the business and, consequently, the market value of Essosa's Cuban assets.

The most persuasive evidence as to the attitude of investors toward the Cuban economic and political situation is the market for bonds issued by the Cuban government itself. Upon Castro's takeover in January of 1959, long-term Cuban bonds trading in New York were yielding 4.16%. This was only about .26% more than bonds issued by the United States, indicating that investor confidence in the Batista government was only slightly lower than in the U.S. government itself. By June of 1960, the yield on Cuban bonds had risen to 9.88%, more than double the rate of 18 months earlier; at the same time, the yield on U.S. government bonds stayed relatively even at 3.99%. This sharp rise in the yield of the Cuban bonds reflected a concommitant drop in the market price of the bonds, which were trading at $566. This was a discount of more than 43% from their face value of $1000.

A drop in the price of bonds can be the result of a rise in market interest rates or an erosion in investor confidence in the issuer of the bonds. Market interest rates, as evidenced by the yield on U.S. government securities, held steady during this period. The decline in the price of Cuban bonds was, therefore, not the result of the first of these factors. Rather, investors harbored serious fears that the Cuban government would fail to make interest payments in a timely and regular fashion, or that it would delay or renege altogether on the repayment of the principal. Such fears about the financial responsibility of a bond issuer cause investors to discount the amount they are willing to pay for the bonds in order to compensate for these

risks. In June of 1960, investor doubts about the willingness or ability of the Cuban government to meet its obligations were sufficiently serious that Cuban government bonds were selling at some 57¢ on the dollar.

The market for Cuban government bonds is a particularly useful indicator of investor attitudes toward the Cuban political and economic situation. Since the bonds represented the debt of the government itself, they were not subject to risks associated with other types of investments such as changes in demand for a product, the possibility of unexpected competition, the exercise of bad business judgment, or the imposition of government taxes or regulations that would affect profitability. Also, a government's credit-worthiness is a highly-valued asset, one not lightly jeopardized. Governments therefore are generally less likely to renege on their debts than they are to raise taxes, nationalize certain portions of their economy, impose burdensome regulations or otherwise interfere with businesses operating on their soil. Consequently, the willingness of investors to buy Cuban government bonds must be viewed as the high-water mark of investor confidence in the Cuban economic and political system. Under no circumstances would investors have discounted the value of business assets that lay within the grasp of the Cuban government less than the obligations of the government itself. Indeed, a prudent, knowledgeable investor attempting to value Essosa's assets in June of 1960 would have started with 43%, the amount by which the market discounted the bonds of the Cuban government, and then added further discounts on the basis of the addi-

tional risks to which the oil refining and distribution business would be subject, among them the following: the risk that exchange controls would continue to block or delay the expatriation of profits; the possibility that the Cuban government might force Essosa to refine Soviet crude oil and then use the refined product to enter the retail market in competition with the western oil companies; the risk that government regulation or taxation would be drastically increased; and the very serious danger that key personnel would flee Cuba as the Castro regime became more oppressive.

■ In light of these factors, the court finds that, in valuing Essosa's Cuban assets, a knowledgeable buyer would have discounted the value of those assets by a risk factor of some 65%. The book value of the refinery and other assets was $76 million; the discounted value would therefore have been $26.6 million, substantially less than the $48 million in liabilities.[7] The court therefore finds that, as of June 30, 1960, an arms' length, knowledgeable investor would have been unwilling to pay more than a nominal sum for Essosa's Cuban assets, if such assets were burdened with Essosa's liabilities. Essosa was therefore left insolvent after the reorganization.[8]

### C. The Cuban Law Defense

Plaintiff suggests that even if Essosa was insolvent on the date of the reorganization, it could have defeated any fraudulent conveyance action by raising the law of Cuba as a defense. According to plaintiff, Cuban law considers each division of a

7. Even in the unlikely event that investors had discounted Essosa's Cuban assets no more than Cuban government bonds, the assets would have been worth only about $43 million, still substantially less than Essosa's liabilities.

8. While the court has found that Essosa was in fact insolvent after the reorganization, such a finding is not necessary to sustain defendant's position. It would have been enough for the court to find that the question of solvency was sufficiently in doubt so that a fraudulent conveyance action by Esso Export against Standard

would have had a reasonable probability of success. As is more fully explained below, see pp. 354—355 infra, if a creditor has a reasonable prospect of collecting the debt, the debt is not worthless, particularly where the amount owed is very large. Plaintiff does not dispute that there was much political and economic turmoil in Cuba in mid-1960, sufficiently so as to raise reasonable doubts about Essosa's solvency. These doubts would have provided a sound basis for bringing a fraudulent conveyance action with a reasonable prospect of success.

company as a separate legal entity. Therefore, plaintiff argues, Essosa's non-Cuban assets could not have been reached by the Cuban division's creditors. The transfer of the non-Cuban assets out of Essosa, plaintiff's argument continues, could not have worked a fraud on Esso Export because those assets were never at risk as a result of debts incurred by the Cuban division.

The position advanced by plaintiff is more doubtful than its argument suggests. In the first place, the state of Cuban law is far from clear. While plaintiff's expert cited a number of Cuban decisions that appear to support its position, the cases in which the issue arose did not involve claims by creditors but questions of income tax liability. There are no Cuban authorities that deal specifically with the question of whether creditors of one corporate division can reach the assets of another division of the same corporation. At best, then, plaintiff has presented a legal argument that a court might or might not have accepted in adjudicating a fraudulent conveyance claim by Essosa against Standard.

To reach this issue at all, however, a court would first have had to rule that the law of Cuba governed the rights and responsibilities of Essosa and its creditors. Essosa's debt to Esso Export was payable in New York in U.S. dollars. Key aspects of the underlying transaction were consummated in New York. Esso Export, the creditor, was a U.S. corporation. There is a reasonable possibility—indeed a likelihood—that an American court entertaining an action by Esso Export against Essosa would have applied U.S. law and treated Essosa as a single entity responsible for the debt.

It is unnecessary, however, for this court to predict with absolute certainty the resolution of these and other legal hurdles that Esso Export would have faced had it brought a fraudulent conveyance action against Standard. The issue here is not whether such an action would have been certain to succeed but only whether there was a reasonable prospect that plaintiff would have recovered the amounts owed. *Parmelee Transportation Co. v. United States*, 173 Ct.Cl. 139, 153–56, 351 F.2d 619 (1965).[9] While a remote possibility of success in a lawsuit will not normally establish a reasonable prospect of recovery, the *Parmelee* court noted that a chance of recovery in the 40–50% range would ordinarily be sufficient and that, where the "stakes are ... high, a suit may be '100% justified' even though the probability of recovery is miniscule." *Id.* at 154, 351 F.2d 619. Indeed, *Parmelee* notes that "[a] lawsuit might well be justified by a 10 percent chance." *Id., quoted in Sollitt*, 1 Cl.Ct. at 345.

Here, the stakes were high indeed. Esso Export's claim against Essosa was almost $27.4 million, an amount that an arms' length creditor would not have lightly abandoned. The possibility of pursuing the assets of the debtor by means of a fraudulent conveyance action would doubtless have been considered and pursued. While such a suit would have had a number of hurdles to overcome, the probability of success would have been well in excess of 10%, more likely in the range of 50–60%. Under such circumstances, an arms' length creditor would easily have found it worthwhile to bring suit.[10]

9. While *Parmelee* was decided under section 165 of the Code and the deduction here is claimed under section 166, the two sections are closely analogous and should be read *in pari materia*. This court has recently cited *Parmelee* on this very point in a case involving section 166. *Sollitt*, 1 Cl.Ct. at 345.

10. The court notes that, in addition to the $27.4 million Essosa owed to Esso Export, it owed more than $20 million to other creditors who presumably were unrelated to plaintiff and its affiliates. No evidence was introduced as to what happened to these other debts. While the court will not go so far as to draw a negative inference from plaintiff's failure to present evidence so peculiarly within its control, *but see Coplin v. United States*, 6 Cl.Ct. 115, 148 (1984), it is worth noting that evidence that other substantial creditors had abandoned their claims would have been highly probative in resolving the issues presented.

### D. *The Collateral Action Issue*

Plaintiff next argues that the existence of a cause of action against Standard under a fraudulent conveyance theory does not impart value to the otherwise uncollectible debt. Under plaintiff's theory, in determining whether a debt is worthless for purposes of Internal Revenue Code section 166, the court may consider only the possibility of recovery in an action brought directly on the debt and must ignore any possible recovery in a collateral action such as under a theory of fraudulent conveyance. Plaintiff's argument is supported by neither the language nor the logic of the statute.

■■■ Section 166 does not, by its terms, draw a distinction between recovery on the debt and recovery in a collateral action. The section speaks only of whether the debt is worthless, an inquiry that courts have consistently undertaken in a common-sense, nontechnical fashion. *Minneapolis, St. Paul & Sault Ste. Marie R.R. v. United States*, 164 Ct.Cl. 226, 240 (1964); *Sollitt Construction Co. v. United States*, 1 Cl.Ct. 333 (1983); *Levin v. United States*, 220 Ct.Cl. 197, 597 F.2d 760 (1979). *See also Boehm v. Commissioner*, 326 U.S. 287, 292, 66 S.Ct. 120, 123, 90 L.Ed. 78 (1945); *Dustin v. Commissioner*, 467 F.2d 47 (9th Cir.1972); *Allen-Bradley Co. v. Commissioner*, 112 F.2d 333 (7th Cir.1940); *Thom v. Burnet*, 55 F.2d 1039 (D.C.Cir. 1932). The fraudulent conveyance action is one of the standard legal tools available to creditors seeking to satisfy obligations owed by insolvent or recalcitrant debtors. As a matter of commercial reality, a creditor who can pursue a debtor's assets in the hands of a third party will not normally turn his back on a substantial debt and give it up as worthless. It would serve no policy of the tax code to reject a simple, common sense construction of section 166 in favor of the arcane line-drawing suggested by plaintiff.[11]

■■■ Although there is no authority directly controlling, *Parmelee Transportation Co.* provides significant guidance. In that case, the taxpayer sought a deduction under section 165 for losses arising from the destruction of an intangible asset, a century-old business relationship that had come to an abrupt end in 1955. The court denied the deduction for 1955 because the taxpayer had brought an antitrust action that was based upon the facts and circumstances leading up to the destruction of its business relationship. Had the *Parmelee* court drawn the type of distinction suggested by plaintiff here, it would have ignored the pending antitrust suit in determining whether the taxpayer had suffered the loss of an intangible asset. The asset in question—Parmelee's business relationship with certain railroads—was only tangentially related to the lawsuit which sought to enforce rights established by statute, not by common law or contract.[12]

---

**11.** While plaintiff argues that "[a] fraudulent conveyance action against a third party is not based on the debt, but is merely a collateral action in which recovery is measured by the debt," it does not elaborate on the nature of this proferred distinction. A review of the law applicable to fraudulent conveyance actions discloses that the distinction suggested by plaintiff is tenuous at best. Where a conveyance is fraudulent against a creditor, the creditor may pursue the debtor's assets in the hands of the third party in order to satisfy the debt. Unif. Fraudulent Conveyance Act § 9, 7A U.L.A. 304 (1978). The theory behind this type of action is that "the creditor has a claim on the property of his or her debtor, constituting a fund from which the debt should be paid, and the debtor may not ignore the right or equity of his or her creditors to be paid out of it." *Rainier Nat'l*

*Bank v. McCracken*, 26 Wash.App. 498, 615 P.2d 469, 474 (Div. 1 1980). If the creditor is successful in the fraudulent conveyance action, the debt is extinguished. "It is well-settled that the creditor may elect to recover either the property itself, or its cash value in *satisfaction of the debt*." *Tcherepnin v. Franz*, 489 F.Supp. 43, 45 (N.D.Ill.1980) (emphasis added). A fraudulent conveyance action is therefore more accurately viewed as one of the remedies available for creditors to obtain satisfaction of a debt than as a wholly collateral action, as plaintiff suggests.

**12.** By comparison with a fraudulent conveyance action, which extinguishes the debt, *see* n. 11, *supra*, Parmelee's antitrust action may or may not have foreclosed further recourse to a common law action for breach of contract or interference with prospective business advantage.

The *Parmelee* court was not distracted by such fine distinctions, recognizing that what mattered was not the legal theory employed but whether the taxpayer had a reasonable prospect of making his loss whole. Applying the same realistic approach in this case leads the court to reject plaintiff's theory.[13]

The principal authority cited by plaintiff is *Zeeman v. United States*, 275 F.Supp. 235 (S.D.N.Y.1967), *modified on other grounds*, 395 F.2d 861 (2d Cir.1968), where the court seemed to suggest that pending lawsuits would not defeat a claim for a bad debt deduction where such actions "would not be recovery on the debt." 275 F.Supp. at 251. This statement from *Zeeman*, insofar as it advances plaintiff's position, is dicta, entirely unsupported by authority and plainly not intended to be dispositive of this issue. Indeed, on the very next page, the court found that "none of [these claims] provided a reasonable enough prospect of recovery to warrant a postponement of a deduction for a bad debt." *Id.* at 252. This finding would have been entirely superfluous if the court had interpreted section 166 as plaintiff suggests.

### Conclusion

Plaintiff has failed to establish that it is entitled to recover on its claim for a refund of taxes paid for fiscal year 1960. Pursuant to RUSCC 54(b), there being no just reason for delay, the clerk is directed to dismiss Count VI of the Petition filed May 29, 1979, with costs to the prevailing party.

**13.** Adoption of plaintiff's theory would lead to the anomalous result that a taxpayer would be entitled to a bad debt deduction even though it had recourse to adequate collateral or to a fully solvent guarantor.